Filed 6/2/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LOS ANGELES WATERKEEPER, | B309151 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS171009) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Appellant; | |
| REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES REGION, | |
| Defendant and Respondent; | |
| CITY OF BURBANK, | |
| Real Party in Interest and Appellant. | |

| | |
|---|---|
| LOS ANGELES WATERKEEPER, | B309153, B309155, B309148 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. Nos. BS171010, BS171011, BS171012) |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Appellant; | |
| REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES REGION, | |
| Defendant and Respondent. | |
| | |
| LOS ANGELES WATERKEEPER | B312949 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BS171009) |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed in part and reversed in part.

Chatten-Brown, Carstens & Minteer, Amy Minteer, Michelle N. Black; Sycamore Law, Daniel Cooper; Kelly Clark and Benjamin Harris for Appellant Los Angeles Waterkeeper in Nos. B309151, B309148, B309153, B309155 and Respondent Los Angeles Waterkeeper in No. B312949.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Eric M. Katz and Jessica Barclay-Strobel, Deputy Attorneys General for Appellant State Water Resources Control Board and Respondent Regional Water Quality Control Board, Los Angeles Region.

Somach Simmons & Dunn, Roberta L. Larson, Brittany K. Johnson and Michelle E. Chester for California Association of Sanitation Agencies, Association of California Water Agencies and WateReuse Association as Amici Curiae on behalf of Appellant State Water Resources Control Board.

Amy A. Albano, Christopher Chwang; Brownstein Hyatt Farber Schreck, Stephanie Osler Hastings, Elisabeth L. Esposito and Jessica L. Diaz for Appellant City of Burbank.

———————————————

In 2017, the Regional Water Quality Control Board, Los Angeles Region (Regional Board) renewed permits allowing four publicly owned treatment works (POTWs) to discharge millions of gallons of treated wastewater daily into the Los Angeles River and Pacific Ocean. The Regional Board issued the permits over the objections of Los Angeles Waterkeeper (Waterkeeper), an environmental advocacy organization. Waterkeeper sought review of the permits before the State Water Resources Control Board (State Board), and the State Board declined review.

Waterkeeper then filed petitions for writs of mandate against the State and Regional Boards (collectively, the Boards),

naming the cities that owned the four POTWs as real parties in interest. Waterkeeper contended the Boards had a duty under article X, section 2 of the California Constitution (article X, section 2) and the Water Code to prevent the waste and unreasonable use of water. Waterkeeper alleged the Boards had failed in that duty by issuing the permits without evaluating whether the quantities discharged were reasonable, or whether the treated wastewater could be recycled or otherwise put to better use. Waterkeeper further alleged the Regional Board issued the permits without making findings required under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).

The Boards demurred to the petitions, arguing the Constitution and Water Code imposed no duty, and that wastewater discharge permits were exempt from CEQA under Water Code section 13389.

The trial court overruled the demurrer as to the State Board, finding the State Board had a constitutional and statutory duty to prevent the waste of water. The trial court found the enormous discharges from the POTWs triggered the State Board's duty, and therefore the State Board had to evaluate whether the discharges were reasonable. Although the trial court acknowledged it could not compel the State Board to fulfill its duty in any particular way, mandamus would lie to compel the State Board to take *some* action. Because Waterkeeper alleged the State Board had taken no action at all in regard to the POTWs' discharges, the trial court concluded Waterkeeper had adequately pleaded a basis for mandamus.

The trial court sustained the demurrer as to the Regional Board. Although the trial court found the Regional Board also

4

had a general duty to prevent the unreasonable use of water, the court ruled that duty was not triggered in this case given the different roles of the State and Regional Boards. Whereas the State Board was in charge of comprehensive planning and allocation of water, the Regional Board was responsible solely for water quality, that is, ensuring state waters were sufficiently free of pollution. The trial court found the Regional Board lacked the authority to compel POTWs to recycle more wastewater, and that it was impractical to include a reasonable use assessment as part of the wastewater discharge permit renewal process, particularly given the complexities of wastewater recycling.

The trial court further ruled the Regional Board did not have to comply with CEQA when issuing the wastewater discharge permits to the POTWs. Although the exemption under Water Code section 13389 by its terms applied only to chapter 3 of CEQA, governing the preparation of environmental impact reports, the trial court concluded the exemption was meant to mirror a federal statute that exempted wastewater discharge permits entirely from the federal equivalent of CEQA. In support of its conclusion, the court cited case law and regulations interpreting Water Code section 13389.

Waterkeeper and the State Board proceeded to trial. After receiving evidence, the trial court concluded Waterkeeper had proven the State Board had not fulfilled its duty in regard to the four POTWs. The trial court found dispositive the State Board's interrogatory responses, which the court interpreted as admitting the State Board had never evaluated whether the discharges from the POTWs were reasonable. Although the State Board and real parties offered evidence the State Board actively was collecting data on wastewater discharges and incentivizing water

5

recycling through funding, streamlined regulations, and other methods, the court found none of this satisfied the specific duty to evaluate the four POTWs' discharges.

Accordingly, the trial court issued four judgments and four writs of mandate directing the State Board to evaluate whether the discharges from each of the four POTWs were reasonable, and to develop a factual record to allow for judicial review of whatever decision the State Board reached.

The State Board appeals from the four judgments against the State Board. Real party City of Burbank appeals from the judgment against the State Board pertaining to the Burbank POTW. Waterkeeper also appeals, challenging the trial court's sustaining the demurrer in favor of the Regional Board. We consolidated all these appeals for briefing, argument, and decision. The trial court later awarded Waterkeeper attorney fees under Code of Civil Procedure section 1021.5, and we have consolidated the State Board's appeal from that award with the other appeals as well.

This is our second opinion in this case. Our original opinion affirmed the judgments of dismissal in favor of the Regional Board and reversed the judgments and writs of mandate against the State Board. The Boards then filed a request for modification, asking that we clarify certain issues addressed in our opinion, specifically the Regional Board's authority to regulate the unreasonable use of water, and the scope of the CEQA exemption in Water Code section 13389. On our own motion we vacated our opinion, ordered rehearing, and received responses to the Boards' modification request from Waterkeeper and City of Burbank.

6

Having reviewed the additional briefing from the parties, we conclude our original holdings, as well as the reasoning in support of those holdings, were correct. We, however, have made certain modifications to clarify the scope of our holdings as set forth in our Discussion, *post*. In addition to addressing the modification request and the responses to that request, we have made minor changes to our original analysis in support of our holdings and added information to our Factual and Procedural Background.

We agree with the trial court that the Regional Board had no duty to evaluate the reasonableness of the POTWs' discharges when issuing the permits. The Regional Board's purview is water quality, not reasonable use, and the Legislature has not authorized the Regional Board to determine whether a POTW's discharges could be put to better use. Although Waterkeeper argues constitutional mandates apply to all government actors, the applicable language of article X, section 2 and the Water Code is too unspecific to compel the Regional Board to take on a role for which it was not empowered.

We further hold that Waterkeeper has not adequately pleaded entitlement to mandamus against the State Board, and the trial court should have sustained the State Board's demurrer. Assuming arguendo the State Board has a duty to prevent the unreasonable use of water, that duty is highly discretionary, and nothing in article X, section 2 or the Water Code requires the State Board to take action against any particular instance of purported unreasonable use or category of unreasonable use. The trial court correctly noted mandamus will not lie to compel an agency to exercise its discretion in a particular way, but then ran afoul of that principle by ordering the State Board to investigate

7

particular instances of unreasonable use identified by Waterkeeper. Although the court justified this by finding the enormity of the POTWs' discharges was "unique," that is not a workable legal standard, nor one supported by the language of the Constitution or the Water Code.

We reject Waterkeeper's position that the issuance of wastewater discharge permits constitutes an affirmative governmental act that requires compliance with the reasonable use doctrine embodied in article X, section 2. Again, neither the constitutional provision nor the Water Code imposes any limits on the State Board's discretion how to prevent unreasonable use of water. The Legislature has opted not to include a reasonable use assessment as part of the wastewater discharge permitting process, and we will not override that determination.

We decline to decide broadly, as the trial court did, whether Water Code section 13389 exempts the Regional Board from all provisions of CEQA when granting the type of wastewater discharge permits at issue in this case. Rather, we address only whether the Regional Board must comply with Public Resources Code section 21002, the only specific provision of CEQA invoked by Waterkeeper. We conclude Public Resources Code section 21002 does not itself impose any environmental review requirements, but merely states a policy to be effectuated through the environmental review requirements located in other chapters of CEQA, such as the environmental impact reports governed by CEQA chapter 3. Thus, Public Resources Code section 21002's policy guidance has force only to the extent an entity otherwise is obligated to comply with CEQA's environmental review requirements. Because Water Code section 13389 expressly exempts the wastewater discharge

8

permits at issue here from an environmental impact report requirement, Public Resources Code section 21002 is inapplicable. The trial court did not err in sustaining the demurrer to Waterkeeper's CEQA causes of action.

We therefore affirm the judgments of dismissal in favor of the Regional Board and reverse the judgments and writs of mandate against the State Board. Our reversal of the judgments against the State Board requires us also to reverse the award of attorney fees.

## REGULATORY BACKGROUND

The Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.; Porter-Cologne Act) "is the principal law governing water quality regulation in California." (*Monterey Coastkeeper v. California Regional Water Quality Control Bd., etc.* (2022) 76 Cal.App.5th 1, 8 (*Monterey Coastkeeper*).) The goal of the Porter-Cologne Act is " 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.' [Citation.]" (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619 (*City of Burbank*).)

"The Legislature designated the State Board and nine regional water quality control boards . . . as the agencies with primary responsibility for the regulation of water quality under the Porter-Cologne Act. ([Wat. Code,] § 13001.) The State Board formulates and adopts state-wide policy for water quality control, allocates funds, and oversees the activities of the regional water boards. ([*Id.*,] §§ 13140, 13320.) Each regional water board is responsible for, among other things, water quality protection, permitting, inspection, and enforcement actions within its region.

9

([*Id.*,] § 13225, subd. (a).)" (*Monterey Coastkeeper*, *supra*, 76 Cal.App.5th at p. 8.)

One function of the regional water quality control boards is to issue wastewater discharge permits, such as the permits at issue in the instant case. (*Monterey Coastkeeper*, *supra*, 76 Cal.App.5th at p. 8, citing Wat. Code, §§ 13263, 13269.) The type of permits issued in this case trace back to the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act. (*City of Burbank*, *supra*, 35 Cal.4th at pp. 619–620.)

The Clean Water Act establishes " 'effluent limitations,' which are restrictions on the 'quantities, rates, and concentrations of chemical, physical, biological, and other constituents'; these effluent limitations allow the discharge of pollutants only when the water has been satisfactorily treated to conform with federal water quality standards." (*City of Burbank*, *supra*, 35 Cal.4th at p. 620, citing 33 U.S.C. §§ 1311, 1362(11).) The Clean Water Act allows a state "to enforce its own water quality laws so long as its effluent limitations are not 'less stringent' than those set out in the Clean Water Act." (*City of Burbank*, at p. 620, citing 33 U.S.C. § 1370.)

The National Pollutant Discharge Elimination System (NPDES) is " 'the primary means' for enforcing effluent limitations and standards under the Clean Water Act. [Citation.] The NPDES sets out the conditions under which the federal [Environmental Protection Agency] or a state with an approved water quality control program can issue permits for the discharge of pollutants in wastewater. (33 U.S.C. § 1342(a) & (b).) In California, wastewater discharge requirements established by the regional water quality control boards are the equivalent of

10

the NPDES permits required by federal law. ([Wat. Code,] § 13374.)" (*City of Burbank*, *supra*, 35 Cal.4th at p. 621.)

The State Board may review a regional water quality control board's action or inaction concerning a wastewater discharge permit, but is not required to do so. (*Monterey Coastkeeper*, *supra*, 76 Cal.App.5th at p. 8, citing Wat. Code, § 13320, subd. (a).) The State Board's decision not to review a regional water quality control board's action or inaction is not subject to judicial review. (*Monterey Coastkeeper*, at p. 8.)

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Events leading to the writ petitions*[1]

The four POTWs at issue in this appeal are the Burbank Water Reclamation Plant (Burbank plant), the Los Angeles-Glendale Water Reclamation Plant (Los Angeles-Glendale plant), the Donald C. Tillman Water Reclamation Plant (Tillman plant), and the Hyperion Water Treatment Plant (Hyperion plant). These plants receive and treat wastewater conveyed via sewer systems. Once treated, the water is either discharged to a watercourse and eventually to the ocean, or recycled to be reused again.

It is undisputed that, on average, millions of gallons of water a day, and in the Hyperion plant's case hundreds of millions of gallons a day, are discharged into the Los Angeles River and ocean rather than recycled. The evidence at trial demonstrated significant differences among the POTWs in gallons recycled relative to gallons discharged. As summarized

---

[1] This background is summarized largely from undisputed findings by the trial court.

11

by the trial court in its ruling after trial, the Burbank plant's average daily discharge was 2.17 million gallons of treated wastewater, and its average daily recycled water production was 2.55 million gallons.  The Glendale plant's average daily discharge was 8.8 million gallons, and its average daily recycled water production was 4.2 million gallons.  The Tillman plant's average daily discharge was 27.5 million gallons, and its average daily recycled water production was 6.5 million gallons.  The Hyperion plant's average daily discharge was 230 million gallons, and its average daily recycled water production was 37 million gallons.

The Regional Board has issued wastewater discharge permits to the POTWs for decades, renewing them approximately every five years.  The Regional Board most recently considered renewing the POTWs' wastewater discharge permits in 2017, with amendments incorporating updated water quality requirements.  The Regional Board held public hearings regarding the permits, and Waterkeeper submitted oral and written comments on each permit.

In its comments, Waterkeeper noted the potential for greater recycling and reuse of the treated water from the POTWs. Given that potential, Waterkeeper contended the Regional Board and State Board were obligated under state water law, including article X, section 2, to determine whether the quantity of water discharged from the POTWs constituted a waste or unreasonable use.  In its comments concerning the Burbank, Los Angeles-Glendale, and Tillman plants, Waterkeeper further contended the Regional Board was required to make findings under chapter 1 of CEQA as to whether there were feasible alternatives to the discharges with fewer environmental impacts.

12

The Regional Board renewed the permits, concluding it was not required to conduct a waste and unreasonable use analysis beforehand. The Regional Board further concluded Water Code section 13389 exempted the wastewater discharge permitting process from CEQA. Waterkeeper sought review of the Regional Board's decision before the State Board. The State Board declined to take review.

## 2. *The writ petitions*

Waterkeeper then filed four petitions in the trial court for writs of mandate against the Regional and State Boards, each directed at one of the POTW's wastewater discharge permits.[2] The petitions listed as real parties in interest the cities that own and operate the POTWs along with their public works departments.[3]

---

[2] The operative petitions for purposes of this appeal are the three petitions filed September 26, 2017, in case nos. BS171009, BS171010, and BS171011, and the first amended petition filed November 2, 2018, in case no. BS17012.

[3] The petition concerning the Burbank plant listed as real parties in interest the City of Burbank and its Department of Public Works, the City of Los Angeles and its Department of Public Works, Bureau of Sanitation, and the City of Glendale. The petitions concerning the Los Angeles-Glendale and Tillman plants listed the same real parties, and added the City of Glendale's Department of Public Works. The petition concerning the Hyperion plant listed as real parties the City of Los Angeles and its Department of Public Works, Bureau of Sanitation.

13

### a. The Burbank, Los Angeles-Glendale, and Tillman plant petitions

The petitions concerning the Burbank, Los Angeles-Glendale, and Tillman plants are largely duplicative, and we therefore discuss their allegations collectively.  In the petitions, Waterkeeper alleged that the three POTWs, along with the Hyperion plant, are part of an "integrated network . . . that process[es], treat[s], and recycle[s] the majority of wastewater throughout Burbank, Los Angeles, and Glendale."  This integrated network "produce[s] millions of gallons of water per day of secondary and/or tertiary treated water, capable of being reused and put to beneficial use," which could "ultimately increase[ ] Los Angeles' local water supply."  Waterkeeper alleged only a small portion of the treated water is recycled and reused, however, and "the majority of the treated water is discharged into the Los Angeles River, its tributaries, and the Pacific Ocean."

Waterkeeper alleged, "[T]he water being discharged is typically being used by water consumers only once despite the enormous environmental and economic costs of transporting the water to Los Angeles.  Given the scarcity of water resources in Los Angeles and throughout Southern California, additional increases to local water supply serve[ ] a critical role in bolstering local water security and decreasing our dependency on expensive and energy-intensive water imports."

Waterkeeper alleged that article X, section 2 and section 100 of the Water Code impose a "non-discretionary affirmative duty" on the Regional and State Boards "to determine whether a water use is reasonable and beneficial and to prevent the waste and unreasonable use of all water resources in California."  Waterkeeper further alleged Water Code section 275

14

imposes a nondiscretionary duty on the State Board "to prevent the waste, unreasonable use, and unreasonable method of use" of water. Waterkeeper alleged the Regional and State Boards had failed to fulfill these duties by allowing the POTWs to discharge millions of gallons of treated wastewater without determining whether that discharge "constitutes a reasonable and beneficial use or waste and unreasonable use of a water resource."

Waterkeeper further asserted the Regional Board violated CEQA by not conducting an analysis under chapter 1 of CEQA, including whether there were feasible alternatives to the discharges with reduced environmental impacts, and whether there were "cumulative impacts" from the multiple waste discharge approvals. Waterkeeper alleged the exemption in Water Code section 13389 by its terms applied only to chapter 3 of CEQA, associated with preparation of environmental impact reports, and did not apply to chapter 1.

Waterkeeper prayed for writs of mandate compelling the Regional Board to vacate the Burbank, Los Angeles-Glendale, and Tillman plant wastewater discharge permits and conduct further proceedings to analyze whether the discharges were a waste and unreasonable use of water under article X, section 2 and Water Code section 100, and to make findings consistent with the requirements of chapter 1 of CEQA. Waterkeeper also prayed for writs of mandate compelling the State Board to evaluate whether the discharges were a waste and/or unreasonable use under article X, section 2 and Water Code section 100.

### b. The Hyperion plant petition

Waterkeeper alleged the Hyperion plant on average recycled 48 million gallons of treated wastewater per day, a

"small fraction" of the average of 230 million gallons discharged daily into the ocean. (Capitalization & underscoring omitted.)

As in the petitions for the other three POTWs, Waterkeeper asserted causes of action against the Regional and State Boards under article X, section 2 and Water Code section 100, and against the State Board under Water Code section 275.

Differing from the other three petitions, the Hyperion petition alleged not only that the Boards had failed to evaluate whether the Hyperion discharges were unreasonable, but also that the discharges were in fact unreasonable, and the Boards had failed to take action to stop them. Waterkeeper alleged the Regional Board "(a) failed to prevent the ongoing waste of water from Hyperion . . . , (b) improperly authorized a waste and unreasonable use . . . when it adopted the Permit, and (c) failed to consider the reasonableness of the ongoing discharge . . . ." The State Board similarly failed to "prevent the discharge" and failed to "analyze whether the discharge . . . is a reasonable and beneficial use of a water resource."

The Hyperion petition differed also in that it did not allege a cause of action under CEQA.

### 3. *Demurrer*

The trial court related the four petitions and consolidated them for briefing and trial.

The State Board and Regional Board filed a demurrer to all four petitions, contending the petitions failed to state facts sufficient to constitute a cause of action. The Boards argued that article X, section 2 and Water Code section 100 were enacted to prohibit water rights holders from wasting water, not to impose a duty on the Regional Board to assess unreasonable use when issuing a wastewater discharge permit. Nor did article X, section

16

2 and Water Code sections 100 and 275 require the State Board to investigate and enforce every alleged instance of waste or unreasonable use, which requirement would infringe on its prosecutorial discretion. Imposing such a duty would lead to the absurd result of the State Board having to investigate every complaint of unreasonable use of water brought to its attention, including neighbors leaving their lawn sprinklers on overnight.

The Boards argued that although Water Code section 13389 by its terms provides an exemption only from chapter 3 of CEQA, not chapter 1, case law and regulations uniformly have interpreted the exemption as applying to CEQA as a whole, an interpretation consistent with CEQA's structure.

In opposition, Waterkeeper argued article X, section 2 and Water Code section 100 by their language do not merely affect water users, but also broadly impose a duty on all California agencies to prevent waste and unreasonable use of water. Water Code section 275 also imposes a "clear mandate" on the State Board to take appropriate action to prevent unreasonable use of water. Waterkeeper's claims did not infringe upon the State Board's prosecutorial discretion—Waterkeeper's claims arose not because the State Board had failed to investigate a wasteful use of water, but because the Regional Board had affirmatively approved the POTWs' discharges without considering whether those discharges were wasteful or an unreasonable use of water. In other words, the trigger for the duty was not the potential waste of water, but the Regional Board's approval of the potential waste of water without further analysis. The Boards' argument for a complete CEQA exemption was contrary to the plain language of Water Code section 13389, which clearly limited its reach only to chapter 3 of CEQA, not chapter 1.

17

**4.** *The trial court's ruling on the demurrer*

The trial court issued a detailed written ruling on the demurrer, overruling it as to the State Board, and sustaining it as to the Regional Board.[4]

**a.     Ruling concerning the State Board**

The court first concluded article X, section 2 imposed a duty on the State Board to prevent the waste of water.  The court agreed with the Boards "that the existing case law generally concerns waste by water users and no case addresses the State Board's constitutional duty under article X, section 2 to prevent waste or unreasonable use in the discharge of wastewater."  The court nonetheless concluded the "plain language" of that constitutional provision "creates a mandatory duty for all responsible agencies to <u>prevent</u> waste or unreasonable use of water."  The court noted "[a] public agency can be compelled to act to prevent a waste of water pursuant to this constitutional duty," citing *Elmore v. Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 197–198, which held that an irrigation district had a mandatory duty under article X, section 2 to avoid wasting water.  (*Elmore*, at p. 193.)

The trial court found the State Board "most certainly is a responsible agency under article X, section 2," citing *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 444 for the proposition that the State Board's role had evolved to include

---

[4] Although, as noted in our summary, the Hyperion petition differed significantly from the other three petitions, the trial court's analysis largely treated the four petitions identically. Waterkeeper does not challenge that aspect of the trial court's analysis on appeal, and we do not address it further.

"comprehensive planning and allocation of <u>all</u> waters." The court further read *National Audubon* to hold that "the constitutional requirement to prevent waste and unreasonable use is mandatory." Citing *Environmental Defense Fund, Inc. v. East Bay Municipal Utility District* (1977) 20 Cal.3d 327, the court found that article X, section 2 extends to wastewater recycling and reclamation.

Because Water Code section 100 "largely mirrors the applicable language in article X, section 2," the trial court ruled that statutory provision also imposed a duty on the State Board to prevent waste and unreasonable use of water. The court found that Water Code section 275, which provides the State Board "shall take all appropriate proceedings or actions . . . to prevent waste [and] unreasonable use . . . of water," "underscores" the duty imposed under article X, section 2 and Water Code section 100.

The trial court then concluded the State Board's duty was triggered under the facts alleged by Waterkeeper. The court acknowledged, "The State Board has the discretion to decide the manner in which it complies with its constitutional duty . . . , and this discretion imposes no duty to address unreasonable use in the vast majority of circumstances. . . . [T]he court may not compel the Board to exercise its discretion in a particular manner." The court noted it nonetheless could compel the State Board to exercise its discretion when it has not done so, and could also correct an abuse of discretion.

The court stated, "The State Board's discretion has limits and they are exceeded in this case. The four POTWs release hundreds of millions of gallons of water into the Los Angeles River and Santa Monica Bay every day. This level of wastewater

19

discharge . . . is so large that the State Board must do something to prevent waste." Rejecting the argument that imposing a duty would require the State Board absurdly to investigate any potential unreasonable use, however small, the court said, "[T]he issue is one of degree, and the difference in degree between this case and almost all other circumstances is so large as to be different in kind."

The court emphasized that the wastewater discharge permits "are the trigger for the State Board's duty to act, but there otherwise is no link between the two; Waterkeeper is not contending that the State Board must act as part of the permitting process. The State Board's duty arises from its actual or constructive knowledge of the quantity of discharge allowed by the permits." "[T]he State Board is not required to become the water police that investigates and prosecutes every running sprinkler in California," but here, where "[t]he Regional Board permitted a wastewater use when it approved the [waste discharge] permits," the State Board was required to act.

The trial court conceded that no prior court had imposed a duty on the State Board to evaluate the reasonableness of wastewater discharges, but concluded such a duty was consistent with the evolution of state water law and the State Board's expanding role.

The trial court listed "a variety of options" for the State Board to address the POTWs' potential unreasonable water use, including making findings, imposing a general regulation, or taking appropriate enforcement or administrative action. "This is a matter for the State Board's exercise of discretion, but the State Board can be compelled to take some action." "The State Board has not considered the factors surrounding the discharge,

20

and there is no rational connection between its choice not to act and the purpose of Article X, section 2. [Citation.] The State Board must take some action in the exercise of its duty . . . and to do nothing is an abuse of discretion."

The trial court rejected the argument that the State Board was not " 'doing nothing' " because it was conducting a study of the Los Angeles River, the flow of which depended in part on discharges from the POTWs. The court concluded the question of what the State Board must do to satisfy its duty was a fact issue for trial.

### b. Ruling concerning the Regional Board

The trial court ruled that the Regional Board had the same "general constitutional duty" as the State Board to prevent waste and unreasonable use, but concluded the Regional Board "does not have a duty to impose reasonable use requirements for the extraordinarily large discharges at issue in this case." The court based this conclusion on the different roles played by the two entities.

The court explained, "[T]he State Board is the state agency in charge of the comprehensive planning and allocation of water [citation] that establishes statewide policy for water quality control ([Wat. Code,] §13140), and has a statutory duty to institute all appropriate proceedings to prevent waste and unreasonable use ([*id.*,] §275)."

The Regional Board, in contrast, only " 'formulate[s] and adopt[s] water quality control plans for all areas within [its] region.' [Citations.]" The court noted that "[w]ater quality plans do not address the amount of wastewater discharge," and although wastewater discharge permits do address discharge amounts, "they address only specific issues, including 'the

21

beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, the need to prevent nuisance, and the provisions of Section 13241.' Water Code §13263. None of these considerations concern[s] whether the quantity of water discharged is a waste or unreasonable use. As a result, the Regional Board does not have a specific statutory duty to prevent the unreasonable use of treated wastewater." As for the Regional Board's constitutional duty, the court concluded that duty was "too general to require [the Regional Board] to take action in issuing a discharge permit concerning water quality."

The trial court listed practical reasons not to impose a duty on the Regional Board to consider waste and unreasonable use when issuing a wastewater discharge permit. The court found the Regional Board had no authority to require cities to recycle their wastewater, because under Water Code section 1210 the owner of a POTW has an " 'exclusive right to the treated wastewater,' " and case law considers treatment and disposal of sewage to be a " 'municipal affair.' " The court further found it would be impractical to include a determination concerning recycling during the wastewater discharge permit proceedings because "[n]one of the facts concerning recycling are before the Regional Board when it considers a permit [citation], and no law mandates the use of recycled water."

The trial court also noted, "[A] city's decision to recycle water is largely a feasibility consideration involving complex, technical issues, including: (a) the physical and technical capacity to treat wastewater for reuse; (b) health and safety criteria; (c) demand for recycled water by the city's customers; (d) existence of sufficient infrastructure to allow the city to

deliver the recycled water to customers; (e) sufficient funding—whether through water rates, grants, or government loans—for the necessary operational components of a recycled water project; and (f) the effects of decreased discharges to a watercourse which must be approved by the State Board under Water Code section 1211." "[G]iven the numerous complexities associated with water recycling, a requirement that regional boards consider whether wastewater should be recycled, in lieu of discharged, at the time a discharger seeks to renew its discharge permit is simply bad public policy."

The trial court rejected Waterkeeper's argument at the hearing on the demurrer that the Regional Board did not have to require more recycling, but could remedy the wasteful discharges simply by reducing the amount of discharge allowed under the permits. As Waterkeeper argued, this would leave it to cities to determine how to comply with the reduced discharge allowance, perhaps by reducing municipal water use and therefore the amount of wastewater flowing into the POTWs. The trial court disagreed with this approach, reasoning that "a regional board should not impose discharge reductions without a feasible plan in place for either the reduction of wastewater and/or recycling of that wastewater." Also, the Legislature had placed the State Board in charge of any discharge reductions under Water Code section 1211, "indicat[ing] that the regional boards should not address the issue."

In conclusion, the trial court stated, "The regional boards' statutory duties exist to ensure water quality only and their constitutional duty to prevent waste does not require them to step in where the State Board has a concomitant planning duty."

23

Turning to the CEQA causes of action, the trial court concluded that the purpose of the exemption under Water Code section 13389 was to parallel the federal Clean Water Act's complete exemption for wastewater discharge permits from the federal equivalent of CEQA, an exemption intended to avoid delays in authorizing waste discharges. "As such, section 13389's exemption from CEQA for wastewater discharge permits is complete," despite the language of the exemption referring only to CEQA chapter 3. In support, the court cited case law holding, inter alia, that the exemption under Water Code section 13389 also applied to chapter 2.6 of CEQA. The court further found that California Code of Regulations, title 23, section 3733, a State Board regulation interpreting Water Code section 13389 as a complete CEQA exemption, was entitled to deference. Thus, Water Code section 13389 "not only relieves the Regional Board of the Chapter 3 requirement to prepare an [environmental impact report], but also relieves the Regional Board of those CEQA obligations that ordinarily are satisfied through preparation and consideration of an [environmental impact report], including the policies of Chapter 1 to consider feasible alternatives and mitigation measures."

5.    *Decision after trial*

The consolidated cases proceeded to trial on the causes of action against the State Board, following which the trial court issued another detailed written decision granting the writs of mandate sought by Waterkeeper.

In its written decision, the trial court summarized its ruling on the demurrer and affirmed its conclusion that the State Board had a duty "to assess the four POTWs' waste and unreasonable use when they discharge wastewater." The court

24

rejected the State Board's argument that imposing such a duty would require the State Board to evaluate the discharges of all 800 POTWs in the state, many if not all of which were discharging at least some treated wastewater that otherwise could be recycled. The State Board had confirmed at trial "that the four POTWs [at issue in the case] collectively discharge on average almost 300 [million gallons per day] of treated wastewater into the Santa Monica Bay and the Los Angeles River," and "[t]here is no evidence that any other POTW in the state even remotely comes close to" that level of discharge. "As the court ruled on demurrer, the issue is one of degree, and the difference in degree between this case and any other circumstance is so large as to be different in kind. [Citation.] The four POTWs are unique and there is no evidence that the State Board is at risk of being forced to investigate other POTW discharges."

In line with its ruling on the demurrer, the trial court concluded that, although the State Board had discretion how to carry out its duty to prevent waste and unreasonable use, that discretion was "exceeded in this case" given the "hundreds of millions of gallons of water" collectively discharged from the four POTWs every day. "[T]he four POTWs are unique in the level of their wastewater discharge . . . and the State Board can be compelled to exercise its discretion in the first instance."

The trial court found Waterkeeper had proven the State Board had not met its duty to address the potential waste of water from the POTWs. The court found "dispositive" the State Board's interrogatory responses in which the State Board "confirmed that it had never conducted any reasonable use or waste analysis of the discharge from any of the four POTWs," and

25

"conceded that it has no position on whether the POTW discharges are a waste or unreasonable use of that water resource."

For example, one interrogatory cited by the trial court asked whether it was the State Board's contention that it had "conducted an analysis or series of analyses functionally equivalent to a REASONABLE USE ANALYSIS evaluating the discharge of wastewater at the HYPERION TREATMENT PLANT . . . ." The State Board responded, in part, "The State Board does not contend that it has conducted an analysis or series of analyses functionally equivalent to a REASONABLE USE ANALYSIS . . . . The State Board contends that it does not have a legal duty to conduct" such an analysis. Another interrogatory asked whether it was the State Board's contention that the Hyperion plant's discharges were not a waste of water, and the State Board responded, in part, "[The State Board] neither contends [the Hyperion plant's discharge] is a 'waste' nor does it contend [the discharge] is not a 'waste,' as that term is understood in the *water rights* context." In light of these and similar interrogatory responses, the trial court stated, "Having performed no analysis and admitting that it has no position on whether the POTWs' discharges are a waste or unreasonable use of wastewater, the State Board has not met its mandatory duty."[5]

---

[5] On appeal, the State Board disputes the trial court's interpretation of the interrogatory responses. Because we conclude the trial court should have sustained the demurrer as to the State Board, we do not address the State Board's arguments challenging the findings at trial.

The trial court then addressed arguments and evidence of the State Board and real parties in interest, concluding none of it established the State Board had met its duty.

The State Board argued that through regulations and the wastewater discharge permits themselves, the State and Regional Board required the POTWs annually to report regarding the amounts of treated wastewater discharged versus reused, and the feasibility of increased recycling. The trial court found these reports "are relevant to a reasonableness/waste evaluation, but no evaluation has occurred," nor did the State Board contend it could not conduct a reasonableness analysis without the reports. The court further found the reports in fact "show[ ] that the discharges constitute considerable potential waste," noting reports that recycled water made up only seven percent of Glendale's water supply in 2017, Burbank projected it would discharge over half of its treated wastewater through 2040, and in 2018 and 2019, Los Angeles had a recycling rate of less than five percent of the authorized discharges.

The trial court disagreed that the State Board had satisfied its duty by awarding billions of dollars in grants and loans to fund water recycling facilities. "The cost of recycling facilities and the State Board's funding efforts are relevant to a reasonable use analysis, but they do not demonstrate that it is preventing waste or unreasonable use of the four POTWS' discharges. The State Board does not require prevention of waste and unreasonable use as a condition of funding of any of these projects."

Although the State Board had promulgated a statewide recycled water policy setting goals for water conservation and the use of recycled water, the policy "does not evaluate, and does not

prevent, unreasonable or wasteful POTW discharges." The court noted the policy had no "mechanisms to enforce recycling goals," and the reporting requirements were not intended to prevent waste and unreasonable use, "but to 'potentially update the recycled water goals in the future.'"

The State Board offered evidence that it had taken steps to streamline permitting of recycled water facilities and expand the potential uses of recycled water, and at the Legislature's direction was investigating the feasibility of authorizing recycled water for potable uses. The trial court stated, "Obviously, the scientific and legal limitations on recycled water use, and the recent expansion of such use through regulation on indirect potable use and a future regulation on direct potable use, are relevant to the State Board's duty to evaluate the reasonableness of the POTWs' discharge. They may well restrict any ability of the POTWs to avoid waste and show the discharge as reasonable. But they are not a substitute for such an evaluation."

The State Board offered evidence it was conducting a study to determine the water flow necessary in the Los Angeles River to support aquatic life and recreational uses, which in turn would affect to what degree the Burbank, Los Angeles-Glendale, and Tillman plants could reduce their discharges into the river in favor of recycling. The trial court found this study "does not demonstrate that the State Board is taking any action to prevent the waste or unreasonable use of wastewater from the POTWs." Even assuming the discharges supported beneficial uses such as wildlife habitat and recreation, the court concluded beneficial uses nonetheless can be wasteful and unreasonable, and the river study did not satisfy the State Board's duty to so determine.

The State Board offered evidence it was developing new water use efficiency standards, which would reduce indoor water use, and therefore reduce the wastewater flowing to the POTWs. The trial court stated water conservation "is laudable and may result in less waste/unreasonable use. It is something the State Board should consider in evaluating the POTWs' discharge, but water conservation is not a substitute for the evaluation of reasonable use, nor for the reduction of waste."

The State Board and real parties offered evidence of real parties' progress in reducing wastewater discharges and increasing water recycling, including a pledge from the mayor of Los Angeles to recycle 100 percent of the city's wastewater by 2035. The trial court stated, "Real Parties miss the point. The issue is not whether they have taken steps to conserve and recycle water. The issue is whether the State Board has complied with its duty to evaluate the reasonableness/waste of the POTWs' discharge." Without that evaluation, "it is impossible to claim that any of Real Parties' efforts prevents waste."

The trial court found nothing in the real parties' declarations evaluating the discharges for waste and unreasonable use. Nor had the real parties made any "binding commitment to recycle." The real parties' declarations, moreover, "demonstrate the painfully slow pace of the voluntary municipal recycling efforts."

The trial court wrote, "Nothing in Real Parties' declarations indicates that the State Board has taken any steps to prevent the waste or unreasonable use of the discharges, or even considered the issue as involving waste or unreasonable use of a water resource. Without State Board action, the waste or unreasonable use of the Hyperion[ ] plant discharge may well continue past

29

2035. Hoping and encouraging Los Angeles to eventually put discharged wastewater from the Hyperion plant to its fullest beneficial use does not fulfill the State Board's ongoing duty to prevent the waste or unreasonable use of that discharged wastewater."

In concluding its evaluation of the evidence, the trial court stated, "The State Board argues, without citation to evidence, that its strategy for reducing POTW discharges and increasing recycled water has been to address POTWs as a statewide class of dischargers through a combination of carrots and sticks. [Citation.] Yet, the State Board admits that California is behind on its recycled water goals [citations], and merely encouraging third parties to increase water recycling is not equivalent to preventing waste or unreasonable use of discharged wastewater. Real Parties' recycling and conservation efforts may or may not be reasonable. That is an issue for the State Board to address and decide."

Turning to the question of what the State Board must do to fulfill its duty, the trial court concluded the State Board's only obligation at this stage was to "evaluate whether waste and unreasonable use is occurring at the four POTWs considering relevant factors." The court declined to order the State Board also to craft a remedy, because such an order would presume the State Board would find waste and unreasonable use, which it had yet to do.

In its opening trial brief, Waterkeeper contended the discharges from the POTWs constituted waste under the seven factors listed in the State Board's decision in *In the Matter of Alleged Waste and Unreasonable Use of Water by Imperial Irrigation Dist.* (June 21, 1984) State Water Resources Control

Board Decision 1600.  The trial court declined to apply those factors because article X, section 2 and Water Code section 100 do not require the State Board to apply those factors.  "The State Board has discretion to consider any factors it deems appropriate under the circumstances when undertaking a waste and unreasonable use analysis."[6]

The trial court concluded, "The State Board must conduct an evaluation of the POTWs' reasonable use of their wastewater.  In this evaluation, the relevant factors may include those raised by the State Board and Real Parties of mandatory reporting, the cost of recycling facilities, the scientific and legal limitations on recycled water use, the beneficial uses of Los Angeles River flow, and conservation efforts.  Perhaps the State Board will conclude that Real Parties are doing all they can to recycle, or perhaps the State Board will conclude, as Waterkeeper hopes, that the State Board should impose binding targets and timelines on the POTWs.  Whatever the conclusion, the State Board must evaluate the reasonableness of the four POTWs['] discharge of 300 [million gallons per day] of wastewater."

The trial court continued, "The court will not dictate the precise nature of this evaluation, except that the State Board must consider all relevant factors, develop a factual record to allow for judicial review of its decision, and explain how its discretion was exercised by demonstrating a rational connection

---

[6] The trial court noted that in its reply to the State Board's trial brief, Waterkeeper retreated from its position that the State Board should apply the factors from the Board's 1984 decision.  Waterkeeper instead "s[ought] only to compel the State Board to analyze the discharges and consider all relevant factors in sufficient detail to enable effective judicial review."

between the factors considered, the choices made, and the purposes of Article X, section 2 and [Water Code] section 100."

The trial court entered four judgments and issued four writs of mandate, one for each POTW. The State Board and real party City of Burbank appealed from the judgments, and Waterkeeper appealed from the judgments of dismissal in favor of the Regional Board. We consolidated the appeals for purposes of record preparation, briefing, argument, and decision.

The trial court later ordered the State Board to pay Waterkeeper $737,932.84 in attorney fees under Code of Civil Procedure section 1021.5. The State Board appealed from that order, and we consolidated that appeal with the appeals from the judgments for purposes of argument and decision.

## 6. *First opinion and modification request*

We issued our original opinion on February 27, 2023, affirming the judgments in favor of the Regional Board and reversing the judgments and writs of mandate against the State Board. (*Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023), previously published at 88 Cal.App.5th 874.) The Boards filed a request for modification, asking that we amend the opinion to avoid what they deemed as unnecessarily deciding issues concerning the Regional Board's authority to regulate the unreasonable use of water, and to clarify that our holding concerning the CEQA exemption under Water Code section 13389 applies solely to the type of waste discharge permits at issue in this case.[7] On our own motion, we vacated

---

[7] The Boards further requested we strike certain language that the Boards contend overstated aspects of the trial court's

32

our opinion and ordered rehearing, requesting that Waterkeeper and City of Burbank file supplemental briefs responding to the modification request. We resubmitted the cause upon receipt of this additional briefing.

## STANDARD OF REVIEW

We decide this appeal on the pleadings and demurrer, without reaching the merits of the rulings after trial.

"We independently review the ruling on a demurrer and determine de novo whether the pleading alleges facts sufficient to state a cause of action." (*Santa Ana Police Officers Assn. v. City of Santa Ana* (2017) 13 Cal.App.5th 317, 323.) "[W]e accept as true the well-pleaded allegations in [the] . . . complaint. ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]" ' " (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.) " 'We are not bound by the trial court's reasoning and may affirm the judgment if correct on any theory.' " (*Nede Mgmt. Inc. v. Aspen American Ins. Co.* (2021) 68 Cal.App.5th 1121, 1129–1130.)

We review de novo the interpretation of constitutional and statutory provisions. (*Brookside Investments, Ltd. v. City of El Monte* (2016) 5 Cal.App.5th 540, 548, fn. 4.) "Our task is to

---

ruling, specifically language indicating the trial court ruled not only that the Regional Board lacked authority to order the POTWs to recycle more water, but also lacked authority to order the POTWs to reduce their discharges. Because omission of the challenged language does not affect our reasoning or holding, we have removed it to avoid further controversy. We express no opinion as to the Boards' contention that the struck language was in error.

ascertain the intent of the electorate or the Legislature, thereby giving effect to the law's purpose." (*Wunderlich v. County of Santa Cruz* (2009) 178 Cal.App.4th 680, 694.)

When construing a constitutional provision, we " ' "look first to the language of the constitutional text, giving the words their ordinary meaning." [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent.' [Citation.]" (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.)

Similarly, when construing a statute, " '[w]e first examine the statutory language, giving it a plain and commonsense meaning.' [Citation.] We do not consider statutory language in isolation; instead, we examine the entire statute to construe the words in context. [Citation.] If the language is unambiguous, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' [Citation.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]" (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 972.)

The parties dispute the extent to which we should defer to agency interpretation of the constitutional and statutory provisions at issue in this case. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1.) Our own interpretation of those provisions compels a holding in the State and Regional Boards' favor, and therefore we need not defer to agency interpretation for purposes of this appeal.

## DISCUSSION

**A. Waterkeeper Has Failed Adequately To Plead Causes of Action Under Article X, Section 2 and Water Code Sections 100 and 275**

### 1. Law governing writs of mandate

Waterkeeper sought and obtained from the trial court writs of traditional mandate pursuant to Code of Civil Procedure section 1085, subdivision (a), which empowers courts "to compel a public agency or officer to perform a mandatory duty." (*Ellena v. Department of Ins.* (2014) 230 Cal.App.4th 198, 205 (*Ellena*).)[8] "To state a cause of action for a writ of mandate, one must plead facts showing (1) a clear duty to act by the defendant; (2) a beneficial interest in the defendant's performance of that duty; (3) the defendant's ability to perform the duty; (4) the defendant's failure to perform that duty or abuse of discretion if acting; and (5) no other plain, speedy, or adequate remedy exists." (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 915 (*Collins*).)

Mandamus is appropriate to compel a "ministerial" act, that is, " 'an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his [or her] own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. . . . [Citation.]' [Citations.]" (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public*

---

[8] Code of Civil Procedure section 1085, subdivision (a), provides, in relevant part, "A writ of mandate may be issued by any court . . . to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ."

35

*Health* (2011) 197 Cal.App.4th 693, 700 (*AIDS Healthcare Foundation*).) Put another way, a ministerial act is one " ' "[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take," ' " thus " ' "eliminat[ing] any element of discretion." ' " (*Ellena*, *supra*, 230 Cal.App.4th at p. 205.)

In contrast, when the law imposes a duty but does not direct how that duty should be carried out, mandamus "may not issue to compel an agency to perform that legal duty in a particular manner, or control its exercise of discretion by forcing it to meet its legal obligations in a specific way." (*Marquez v. State Dept. of Health Care Services* (2015) 240 Cal.App.4th 87, 118–119 (*Marquez*); see *Collins*, *supra*, 41 Cal.App.5th at p. 915 [" ' "the duty is discretionary if the [entity] must exercise significant discretion to perform the duty" ' "].) Nonetheless, "[m]andamus will lie to command the exercise of discretion, that is, to compel *some* action." (*AIDS Healthcare Foundation*, *supra*, 197 Cal.App.4th at p. 704, italics added.)

## 2. The law relied upon by Waterkeeper

The parties do not dispute that no law requires POTWs to recycle water. Waterkeeper's arguments instead rely on the reasonable use doctrine embodied in article X, section 2 of the California Constitution and Water Code sections 100 and 275. The question presented in this appeal is whether those constitutional and statutory provisions impose a legal duty on the State and/or Regional Board to evaluate whether the discharges of treated water from the four POTWs constitute a waste or unreasonable use of water.

Article X, section 2, originally enacted in 1928 as article XIV, section 3, amended the Constitution in response to

36

the Supreme Court's decision in *Herminghaus v. Southern California Edison Co.* (1926) 200 Cal. 81 (*Herminghaus*). (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 442–443 (*National Audubon Society*).)

*Herminghaus* addressed the competing water rights of riparians—"those who possess water rights by virtue of owning the land by or through which flowing water passes"—and appropriators—"those who hold the right to divert such water for use on noncontiguous lands." (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1478 (*Light*); see *Herminghaus*, *supra*, 200 Cal. at p. 103.) *Herminghaus* held "that as between the riparian and the appropriator, the former's use of water was not limited by the doctrine of reasonable use." (*National Audubon Society*, *supra*, 33 Cal.3d at p. 442, citing *Herminghaus*, at pp. 100–101.)

Article X, section 2 amended the Constitution "effectively to overrule *Herminghaus*." (*Light*, *supra*, 226 Cal.App.4th at p. 1479.) It provides, in relevant part, "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or

37

unreasonable method of use or unreasonable method of diversion of water. . . . This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."**9**

The effect of the amendment was to "abolish[ ] the right of a riparian to devote water to unreasonable uses, and established the doctrine of reasonable use as an overriding feature of

---

**9** The full text reads, "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." (Cal. Const., art. X, § 2.)

California water law." (*National Audubon Society*, *supra*, 33 Cal.3d at p. 442.) Article X, section 2 "does more than merely overturn *Herminghaus*—it establishes state water policy. All uses of water . . . must now conform to the standard of reasonable use." (*National Audubon Society*, at p. 443.)

Our Supreme Court has characterized article X, section 2 as containing "proscriptions against unreasonable uses and unreasonable methods of diverting water." (*Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 198 (*Environmental Defense Fund*.) Because those proscriptions are self-executing, courts are empowered to enforce them even in the absence of implementing legislation. (*Ibid.*; see, e.g., *Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 141 (*Joslin*) [Supreme Court held use of stream water "to expose or to carry and deposit sand, gravel and rock, is as a matter of law unreasonable"]; *Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 568 [Supreme Court determined that irrigating fields in winter to kill gophers "cannot be held to be a reasonable beneficial use"].)

Article X, section 2 by its express language also authorizes the Legislature to "enact laws in the furtherance of" the prevention of waste and unreasonable use of water. (See *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 625 ["there is 'broad legislative authority for the conservation and regulation of scarce water resources' "].) Courts have interpreted this authority to allow the Legislature "to enact statutes which determine the reasonable uses of water." (*Ibid.*)

The 1928 constitutional amendment did not itself expand the authority of the State Board, which at the time was, "a

39

ministerial body with the limited task of determining priorities between claimants seeking to appropriate unclaimed water." (*National Audubon Society*, *supra*, 33 Cal.3d. at p. 443.) Subsequent legislative enactments and judicial decisions, however, have "greatly enhanced the power of the [State] Board to oversee the reasonable use of water." (*Id*. at pp. 443–444.)

For example, the Legislature has delegated to the State Board the "adjudicatory and regulatory functions of the state in the field of water resources." (Wat. Code, § 174, subd. (a).) Courts have held this delegated power authorizes the State Board both to adjudicate and regulate the unreasonable use of water. (*Imperial Irrigation Dist. v. State Water Resources Control Bd.* (1986) 186 Cal.App.3d 1160, 1163 [State Board "has adjudicatory power in the matter of unreasonable use of water"]; *Light*, *supra*, 226 Cal.App.4th at p. 1485 [State Board's "grant of authority to 'exercise the . . . regulatory functions of the state ([Wat. Code,] § 174) necessarily includes the power to enact regulations governing the reasonable use of water"].) The State Board's adjudicatory jurisdiction over unreasonable use is concurrent with the courts' jurisdiction. (*Environmental Defense Fund*, *supra*, 26 Cal.3d at p. 200.)

Further defining the State Board's role in regard to the reasonable use doctrine, Water Code section 275 provides, "The [Department of Water Resources] and [State Board] shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state."

Water Code section 100, enacted in 1943, merely repeats verbatim the first two sentences of article X, section 2. Apart

40

from lacking the force of a constitutional provision, the parties do not suggest Water Code section 100 is subject to different interpretation than article X, section 2.

Article X, section 2 does not define what constitutes an unreasonable use of water, nor have the courts or the Legislature provided a definition. (See *Light*, *supra*, 226 Cal.App.4th at p. 1479.) Our Supreme Court has said, "[W]hat is a reasonable use of water depends on the circumstances of each case . . . ." (*Joslin*, *supra*, 67 Cal.2d at p. 140.) The court cautioned, however, that "such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance," including "the ever increasing need for the conservation of water in this state, an inescapable reality of life quite apart from its express recognition in [article X, section 2]." (*Joslin*, at p. 140.) The court also instructed that a "beneficial" use is not necessarily a "reasonable" use, noting article X, section 2 expressly limits water rights to " 'such water as shall be *reasonably* required for the beneficial use to be served.' " (*Joslin*, at p. 143.)[10]

### 3. The Regional Board does not have a duty to evaluate whether discharges of treated wastewater are an unreasonable use of water

As set forth above, prior case law has focused on article X, section 2, and by extension Water Code 100, as a prohibition on

---

[10] In *National Audubon Society*, the Supreme Court raised the question whether the test for unreasonable use "refer[s] only to inordinate and wasteful use of water . . . or to any use less than the optimum allocation of water?" (*Supra*, 33 Cal.3d at p. 447, fn. 28.) Because the court resolved that case on other grounds, it declined to answer the question. (*Ibid.*)

41

waste and unreasonable use of water, a prohibition that empowers courts, the Legislature, and the State Board to adjudicate and regulate unreasonable use. Waterkeeper urges us to extend that constitutional provision also to impose a duty on regulatory authorities, in this case the State and Regional Boards, to evaluate whether a particular use of water is reasonable before issuing a wastewater discharge permit.[11]

We conclude the Regional Board has no duty under article X, section 2 or Water Code sections 100 and 275 to prevent the unreasonable discharge from the POTWs. As discussed, to establish entitlement to mandamus, the petitioner must show the defendant agency has the "ability to perform the duty" at issue. (*Collins*, *supra*, 41 Cal.App.5th at p. 915.) As we explain, the Legislature did not empower the Regional Board to enforce the mandates of article X, section 2 when issuing wastewater discharge permits.

As the trial court correctly concluded, the Regional Board's role in state water law is to regulate water quality, that is, to ensure the state's waters are sufficiently free of pollutants to be safe for their intended uses. (Wat. Code, § 13001 [regional water quality control boards, along with State Board, are "principal state agencies with primary responsibility for the coordination and control of water quality"; *id.*, § 13050, subd. (g) [defining

---

[11] City of Burbank argues the discharge of treated wastewater is not a " 'use' of water" as that term is used in article X, section 2, and therefore "the discharge of treated wastewater does not fall within the ambit of" the doctrine of reasonable use. We leave this issue for another day, and assume arguendo the discharge of treated wastewater is subject to the doctrine of reasonable use.

" '[q]uality of the water' " as "chemical, physical, biological, bacteriological, radiological, and other properties and characteristics of water which affect its use"].)

We have found nothing in the Water Code suggesting the Regional Board's role in regulating water quality includes the regulation of wasteful or unreasonable use of water. The Regional Board is responsible for formulating and adopting water quality control plans (Wat. Code, § 13240), which, as the trial court noted, do not include an assessment of waste or unreasonable use (*id.*, § 13050, subd. (j)). Water Code section 13241 lays out a nonexclusive list of considerations in "establish[ing] water quality objectives," none of which includes an assessment of waste and unreasonable use.

Wastewater discharge permits center on water quality. In issuing those permits, the relevant statute provides the Regional Board "shall implement any relevant water quality control plans that have been adopted, and shall take into consideration the beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, the need to prevent nuisance,[12] and the provisions of Section 13241." (Wat. Code, § 13263, subd. (a).) The statute does not mention the waste or unreasonable use of water.

Whereas the Water Code broadly delegates to the State Board "the adjudicatory and regulatory functions of the state in

---

12 " 'Nuisance' " in this context refers to waste treatment or disposal that "[i]s injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property," and "[a]ffects at the same time an entire community or neighborhood, or any considerable number of persons." (Wat. Code, § 13050, subd. (m).)

43

the field of water resources" (Wat. Code, § 174), as well as the power to "take all appropriate proceedings or actions . . . to prevent waste [and] unreasonable use" of water (*id.*, § 275), nothing in the Water Code grants the Regional Board equivalent powers. Indeed, wastewater treatment plants must seek *State* Board approval before the plants make any change in their use of treated wastewater that reduces the flow into a watercourse. (See *id.*, § 1211.)[13] Logically, recycling would produce such a reduction, and therefore would require State Board approval.

We acknowledge that one factor the Regional Board is to consider under Water Code section 13241 when establishing water quality objectives is "[t]he need to develop and use recycled water." (Wat. Code, § 13241, subd. (f).) We do not read this provision as empowering or requiring the Regional Board to assess unreasonable use of water. Rather, by its terms, Water Code section 13241, subdivision (f) requires the Regional Board to consider how its water quality objectives would impact the development and use of recycled water. Waterkeeper makes no argument to the contrary, nor does it discuss this provision in its appellate briefing. Instead, it merely quotes this subdivision in its response to the Boards' request for modification and offers no argument that Water Code section 13241, subdivision (f)

_____

[13] Water Code section 1211 provides, in relevant part, that "[p]rior to making any change in the point of discharge, place of use, or purpose of use of treated wastewater, the owner of any wastewater treatment plant shall obtain approval of the [State Board] for that change." (Wat. Code, § 1211, subd. (a).) This requirement "does not apply to changes in the discharge or use of treated wastewater that do not result in decreasing the flow in any portion of a watercourse." (*Id.*, subd. (b).)

44

comprises an independent obligation to do an unreasonable use analysis. Waterkeeper's cited cases merely confirm that the Regional Board must take the factors under Water Code section 13241 into account when issuing waste discharge permits—they do not address or interpret subdivision (f). (See *City of Burbank, supra,* 35 Cal.4th at p. 625; *City of Arcadia v. State Water Resources Control Bd.* (2010) 191 Cal.App.4th 156, 178.)

In sustaining the demurrer in favor of the Regional Board, the trial court similarly found that the Regional Board's role is to protect water quality, not to regulate unreasonable use, and the Regional Board lacks the authority to compel the POTWs to recycle more water. In its appellate briefing, Waterkeeper does not contest these findings. Rather, it argues that as a constitutional mandate, article X, section 2 necessarily applies to all government actors. Waterkeeper cites case law holding that "all branches of government are required to comply with constitutional directives," and "in the absence of express language to the contrary, *every* constitutional provision is self-executing in the sense that agencies of government are prohibited from taking official actions that contravene constitutional provisions." (*Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1454 (*Leger*); see *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 306–307 (*Katzberg*); *State Board of Education v. Levit* (1959) 52 Cal.2d 441, 460–463 (*Levit*).)

We do not dispute that government actors are bound by the self-executing proscriptions of article X, section 2, and therefore can be held accountable in court or before the proper administrative agencies if they use water in a wasteful and

45

unreasonable manner. (See, e.g., *Elmore v. Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 197 [in mandamus action, farmer properly stated claim that irrigation district had duty under article X, section 2 and other statutes "to avoid wasting water, prevent flooding resulting from its irrigation practices and provide drainage made necessary by its activities"].) Thus, as a general matter, Waterkeeper theoretically could invoke article X, section 2 to bring an action directly against a party that is wasting water.

Waterkeeper, however, does not allege that the Regional Board is wasting water—rather, Waterkeeper alleges the Regional Board has failed to prevent the POTWs from wasting water. Yet nothing in article X, section 2 or the Water Code empowers the Regional Board, a body expressly tasked to regulate water quality, also to prevent the unreasonable use of water by POTWs. Waterkeeper thus seeks to impose a duty on the Regional Board to regulate unreasonable use that is beyond the powers the Legislature gave it.

The language and legislative history of article X, section 2 do not support Waterkeeper's expansion of the Regional Board's duties. Article X, section 2 states that "the general welfare requires . . . that the waste or unreasonable use . . . of water be prevented," but it does not identify any particular official or agency responsible for preventing waste or unreasonable use. Rather, it empowers the courts to enforce the proscription on unreasonable use, and allows the Legislature to "enact laws in the furtherance" of the provision's policies.

We interpret this broad language to grant the Legislature discretion as to how to carry out the principles of article X, section 2, including designating the officials or agencies

46

responsible for doing so.  (See *Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 597 (*Fullerton*) [article X, section 2 "clearly and expressly delegates to the Legislature the task of ascertaining how this constitutional goal should be carried out"].)  As we have explained, the Legislature has given the State Board such authority, but has not granted similar authority to the Regional Board.  The Regional Board's purpose in granting wastewater discharge permits is to determine how much treated wastewater a POTW safely may discharge, not whether the POTW could put the treated wastewater to better use.  We will not override the Legislature's determination in the absence of clear constitutional language to the contrary.

Compelling the Regional Board to conduct a reasonable use assessment on the POTWs would be especially problematic because the reuse of wastewater raises issues our Supreme Court has held are uniquely within the province of the State Board. While recognizing that "courts had traditionally exercised jurisdiction of claims of unreasonable water use," the court nonetheless held that "causes of action seeking to compel [a] defendant to reclaim waste waters must in the first instance be addressed to the [State Board]."  (*Environmental Defense Fund*, *supra*, 26 Cal.3d at p. 187, fn. 1, 199.)  The court based this conclusion on the "statutory regulation of such reclamation, the potential dangers to public health, the problems of feasibility of reclamation, and the complexity of the issues."  (*Id.* at p. 199.)

In short, it makes little sense to read article X, section 2 to impose a duty on the Regional Board that both our Legislature and Supreme Court have determined is the province of the State Board.  A ruling in Waterkeeper's favor would expand the Regional Board's role and change the nature of the wastewater

discharge permitting process without any underlying authority or guidance as to how the Regional Board should comply.

Waterkeeper's cited cases, although stating the principle that all government actors must comply with constitutional directives, address entirely different issues than those present here. Nor do they hold or suggest that all government actors must enforce constitutional directives against others. We discuss each of Waterkeeper's cases in turn.

In *Leger*, a high school student sued a school district and its employees for money damages after a nonstudent attacked the student in a school restroom. (*Supra*, 202 Cal.App.3d at pp. 1452–1453.) The student argued the constitutional right to safe, secure, and peaceful school campuses is self-executing and thus provides a right to money damages for its violation. (*Id.* at pp. 1453–1454.)

The appellate court acknowledged that "in the absence of express language to the contrary, every constitutional provision is self-executing in the sense that agencies of government are prohibited from taking official actions that contravene constitutional provisions." (*Leger, supra,* 202 Cal.App.3d at p. 1454, italics omitted.) The question presented by the student's argument, however, was whether the constitutional right to safe schools "is 'self-executing' in a different sense," namely whether that constitutional provision "provides any rules or procedures by which its declaration of rights is to be enforced, and, in particular, whether it provides citizens with a specific *remedy* by way of damages for its violation in the absence of legislation granting such a remedy." (*Ibid.*)

The appellate court concluded the constitutional provision at issue did not provide for money damages, because it "declares

a general right without specifying *any* rules for its enforcement. It imposes no express duty on anyone to make schools safe. It is wholly devoid of guidelines, mechanisms, or procedures from which a damages remedy could be inferred. Rather, ' "it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." ' . . . [Citation]." (*Leger*, *supra*, 202 Cal.App.3d at p. 1455.)

Similar to *Leger*, in *Katzberg*, the Supreme Court addressed whether the due process clause of the state constitution entitles a party to money damages for a violation of that clause. (*Katzberg*, 29 Cal.4th at p. 307.) In that case, a professor of medicine alleged he was entitled to damages after a university removed him from a department chairmanship without providing a timely name-clearing hearing, in violation of his liberty interest under the due process clause. (*Id.* at p. 303.)

The Supreme Court stated that " '[e]very constitutional provision is self-executing' " in the sense " 'that everything done in violation of it is void.' [Citation.]" (*Katzberg*, *supra*, 29 Cal.4th at p. 307.) Thus, the due process clause "supports an action, brought by a private plaintiff against a proper defendant, for declaratory relief or for injunction." (*Ibid.*) The court held, however, that the due process clause did not provide for a money damages remedy. (*Id.* at p. 329.) The court favorably cited to *Leger* in noting that the due process clause lacks " 'guidelines, mechanisms, or procedures from which a damages remedy could be inferred' " and instead " 'reflects general principles " ' "without laying down rules by means of which those principles may be given the force of law." ' " [Citation.]' [Citation.]" (*Katzberg*, at p. 321.)

49

*Levit* addressed whether the Legislature could enact legislation limiting the State Board of Education's constitutional authority to select textbooks.  (*Supra*, 52 Cal.2d at p. 459.)  In that case, the Legislature prohibited funding for certain science textbooks selected by the State Board of Education for elementary school grades, and the Department of Finance then refused to pay to print those textbooks.  (*Id.* at pp. 446–447.)  Noting, inter alia, case law affirming that all government actors must comply with constitutional provisions, and further that the legislature may not alter powers conferred on a body by the Constitution (*id.* at pp. 460–461), the Supreme Court concluded legislation prohibiting funding for specific textbooks was unconstitutional (*id.* at p. 466).

*Leger* and *Katzberg* both state the principle that constitutional provisions are self-executing and binding on all government actors, but did not apply that principle because it did not answer the issue before them, namely the availability of money damages for constitutional violations.  The analysis in *Leger* and *Katzberg* therefore is not instructive on the issues presented in the instant case.  If anything, *Katzberg* and *Leger* counsel against expanding the reach of constitutional provisions that state general principles without guidelines, mechanisms, or procedures for their enforcement.  *Levit* concerned the limits of the Legislature's authority to intrude upon powers constitutionally delegated to another government body, and similarly is not instructive on the issues here.

Waterkeeper argues it should be left to the State Board and Regional Board how to carry out the duty under article X, section 2, and by dismissing the Regional Board from the mandamus action, the trial court improperly limited the State

50

Board's options for doing so. Because we conclude in the next section Waterkeeper failed adequately to plead entitlement to mandamus against the State Board as well, we need not address this argument.

As noted earlier, in its original appellate briefing, Waterkeeper did not address or challenge the trial court's conclusion that the Regional Board's role was to protect water quality, not regulate unreasonable use, and therefore lacked the authority to compel the POTWs to recycle more water. In response to the Boards' modification request, however, Waterkeeper cites a 1974 opinion by the Attorney General concluding that when prescribing waste discharge requirements under the Porter-Cologne Act, the State Board and regional water quality control boards are "not limited to establishing requirements which will protect only water quality and prevent nuisances." (57 Ops.Cal.Atty.Gen. 19, 20 (1974).)[14] Rather, the State and regional boards "not only can, but must consider the effects of a proposed discharge upon all aspects of the environment." (*Ibid.*) In support, the Attorney General opinion cites expressions of legislative intent to protect the environment in CEQA and elsewhere, which the Attorney General opinion characterizes as "legislative mandates directing that ' . . . highest priority shall be given to environmental considerations . . . .' " (*Id.* at pp. 20–21, quoting *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 804.)

We have no occasion to quarrel with, or decide the validity of the proposition advanced by the Attorney General opinion, to

---

[14] We are not bound by the opinions of the Attorney General, " 'but they are entitled to "great respect." ' " (*Towner v. County of Ventura* (2021) 63 Cal.App.5th 761, 773.)

51

wit, that the Boards must consider more than just water quality and nuisance when prescribing waste discharge requirements. That general proposition, however, does not answer the questions presented in this appeal. The Attorney General opinion speaks of the State Board and regional water quality control boards collectively, without distinguishing their differing roles and obligations, differences that are key to our holding and the trial court's ruling in the instant case. The Attorney General opinion does not explain what it means to "consider" environmental concerns beyond water quality and nuisance, and therefore offers nothing to suggest the Regional Board's environmental consideration in the instant case was inadequate. Certainly, the opinion does not address the Boards' obligations, if any, concerning reuse of recycled wastewater, and predates significant legal developments in that area, such as the Supreme Court ruling that the State Board has primary jurisdiction in actions to compel an entity to reclaim more wastewater. (*Environmental Defense Fund*, *supra*, 26 Cal.3d at p. 187, fn. 1, 199.) In short, given the vintage and generality of the Attorney General opinion, we fail to discern how the opinion is instructive in resolving the matters before us.

Also in its response to the modification request, Waterkeeper argues the Water Code sections empowering the State Board to regulate unreasonable use of water grant "similar authority" to the Regional Board. We have found nothing in the Water Code or case law supporting this proposition, nor has Waterkeeper or the other parties identified any such authority.

Finally, we turn to the primary issue raised by the Boards in their modification request. The Boards contend that there have been "decades of coordination between regional water

quality control boards . . . and the State Board regarding waste/unreasonable use issues and water quality issues." (Fn. omitted.) The Boards argue that our conclusions regarding the Regional Board's authority to regulate unreasonable use of water could "undermine" those coordinated efforts. The Boards ask us to omit from the opinion language limiting the Regional Board's authority to regulate unreasonable use. In the alternative, the Boards request that we clarify we are not deciding whether the regional water quality control boards could regulate the unreasonable use of water if so authorized by the State Board.

Neither the Boards in their modification request nor the other parties in their responses to that request identify any statutory or case authority undercutting our conclusion that the Legislature has empowered the State Board, but not the Regional Board, to regulate whether the POTWs' discharges constitute an unreasonable use of water. We, however, grant the Boards' alternative request to make clear that we express no opinion as to whether the State Board may direct or authorize the regional water quality control boards to take actions related to preventing the waste or unreasonable use of water in coordination with the State Board's efforts in this regard. We have no occasion to express an opinion on that question. Neither in its original briefing nor in its response to the Boards' modification request, has Waterkeeper identified any such direction or authorization by, or coordination with, the State Board regarding the Regional Board in this case.

### 4. Waterkeeper has not adequately pleaded a cause of action against the State Board

The basis upon which we absolve the Regional Board of a duty to assess the POTWs' discharges for waste and

53

unreasonable use does not apply to the State Board, which unquestionably has the authority and expertise to make such an assessment. The parties discuss at length in their briefing whether the State Board has a duty under article X, section 2 and Water Code sections 100 and 275 to prevent unreasonable use of water. We need not decide, however, whether the State Board has a duty, because even if it does, we conclude Waterkeeper has failed to plead facts establishing a derogation of that duty justifying issuing a writ of mandamus. For purposes of our discussion, therefore, we will assume arguendo the State Board has a duty to prevent waste and unreasonable use of water under article X, section 2 and Water Code sections 100 and 275.

As the trial court found, and Waterkeeper does not dispute, whatever duty article X, section 2 and the Water Code impose on the State Board to prevent waste and unreasonable use of water, the duty is highly discretionary. Article X, section 2 and the identical language in Water Code 100 simply state that the general welfare requires that unreasonable use of water "be prevented," without any directives as to how or under what circumstances the government should execute that policy. Thus, to the extent those provisions impose a duty, they do not limit the State Board's discretion as to when and how to satisfy that duty.

Water Code section 275 provides the State Board "shall take all appropriate proceedings or actions" to prevent unreasonable use of water. As the trial court correctly found, this language leaves to the State Board's discretion the determination of what "proceedings or actions" are "appropriate." (See *F & P Growers Assn. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667, 679–680 [statutory language providing that government board "shall" provide certain relief "when the board

54

deems such relief appropriate" "indicate[s] the imposition of the remedy is discretionary"]; cf. *AIDS Healthcare Foundation, supra*, 197 Cal.App.4th at pp. 701–702 [statutory language providing that health officers " 'shall take measures as may be necessary to prevent the spread of . . . disease' " leaves to the officers' discretion what measures are necessary].)[15]

Interpreting article X, section 2 and Water Code sections 100 and 275 to grant the State Board broad discretion is also a practical necessity. The State Board does not have unlimited resources, and cannot possibly investigate or prevent all unreasonable use of water in the state. Deciding where to direct its resources necessarily is a matter for the State Board's discretion, absent clear directives from the Legislature or other legal authority.[16]

---

[15] In its response to the Boards' modification petition, Waterkeeper argues our reading of Water Code section 275 conflicts with federal courts' interpretation of the phrase "appropriate action" as used in a federal statute concerning equality in educational opportunities. Waterkeeper fails to explain why federal decisions interpreting federal statutes should override the state authority cited in this opinion. This argument, moreover, is outside the scope of our rehearing order, which sought briefing solely on the issues raised in the Boards' modification request. Waterkeeper could have, but did not, raise this argument in its original briefing. We therefore deem it forfeited.

[16] As an example of a statute constraining the State Board's discretion, when entities apply to the State Board for permits to appropriate water, the Legislature has directed that the State Board's "duties and responsibilities over appropriative rights include insuring that they meet the mandate of article X,

The trial court recognized the State Board's broad discretion, and further recognized it could not compel the State Board through mandamus to exercise its discretion in any particular manner. (*Marquez, supra*, 240 Cal.App.4th at pp. 118–119.) The trial court nonetheless concluded mandamus was appropriate because Waterkeeper pleaded, and ultimately proved to the court's satisfaction at trial, that the State Board had not exercised its discretion *at all* in regard to the discharges of the four POTWs. In the trial court's view, although it could not compel the State Board to act in any particular way in regard to the four POTWs, the court could compel the State Board to act in the first place.

The trial court erred in reaching this conclusion. As discussed, to the extent article X, section 2 and Water Code sections 100 and 275 impose a duty on the State Board to prevent the waste of water, those provisions, as a matter of language and practical necessity, do not require the State Board to prevent all waste or any particular instance of waste or dictate how to prevent waste. Certainly those provisions do not refer to wastewater treatment plants, discharges from those plants, water recycling, or NPDES permits, and therefore cannot be read to limit the State Board's discretion as to whether to direct its resources towards conserving water through recycling treated wastewater as opposed to other means within the State Board's portfolio.

<hr />

section 2." (*Environmental Defense Fund, supra*, 26 Cal.3d at p. 195, citing Wat. Code, § 1050.) Appropriation is a method by which an entity may obtain a right to use water. (Wat. Code, § 102.) Appropriative rights are not at issue in this case.

Despite the State Board's broad discretion, Waterkeeper's writ petitions seek to compel the State Board to direct its investigatory and enforcement efforts at particular discharges of water that Waterkeeper believes are wasteful.  This is beyond the scope of mandamus, which cannot compel an agency to exercise its discretion in a particular way.

It is true a court may issue a writ of mandamus to compel *some* action when an agency has failed to exercise its discretion at all.  (*AIDS Healthcare Foundation*, *supra*, 197 Cal.App.4th at p. 704.)  Waterkeeper did not allege, however, nor did the trial court find, that the State Board had taken no action to prevent the waste of water.  Rather, Waterkeeper alleged, and the court found, the State Board had taken no action in regard to these particular POTWs, and this was enough to justify mandamus.

In finding the State Board failed in its duty to prevent waste by failing to investigate the discharges from the four POTWs, the trial court obfuscated the distinction between a mandatory duty and a discretionary duty.  Again, article X, section 2 and Water Code sections 100 and 275 do not require the State Board to take action against any particular waste of water, and therefore do not impose a mandatory duty on the State Board to investigate or prevent waste by the POTWs.

Thus, the fact that the State Board has taken no action to prevent a particular waste is insufficient to establish that the State Board is in derogation of a general duty to prevent waste.  This is because allegations or evidence that the State Board has not prevented a particular instance of waste does not establish the State Board has not exercised its discretion to prevent waste through other actions.  Even if the State Board ignored the POTWs' discharges completely, choosing instead to focus on, for

57

example, the unreasonable use of water by irrigation districts, or utilities, or residential water users, nothing in article X, section 2 or Water Code sections 100 and 275 suggests this would exceed the State Board's discretion.

*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768 (*Alejo*) is instructive. The plaintiffs in that case sought a writ of mandate compelling state educational authorities "to rescind a suspension of onsite reviews of school district compliance with state and federal standards in programs benefitting educationally disadvantaged students." (*Id.* at p. 773.) The plaintiffs relied in part on title 20 of the United States Code section 1703(f), a provision of the federal Equal Education Opportunities Act of 1974 (EEOA), which required states " 'to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs,' " as well as federal regulations requiring states to monitor school districts to ensure compliance with federal law. (*Alejo*, at pp. 774, 781.)

The Court of Appeal affirmed the trial court's conclusion that the suspension of onsite monitoring did not give rise to a cause of action under federal law. (*Alejo*, *supra*, 212 Cal.App.4th at pp. 781–782.) The appellate court noted, "The EEOA nowhere requires that states maintain an onsite monitoring program," and therefore determining "[w]hether defendants are fulfilling their 'appropriate action' obligation under the EEOA by performing adequate monitoring of districts would require a thorough examination of all of defendants' monitoring activities in order to determine whether they have abused their discretion." (*Id.* at p. 781.) The plaintiffs, however, in both their pleadings and presentation of evidence "have focused solely on onsite monitoring," which the court characterized as a "myopic view."

58

(*Ibid.*) "By failing to make allegations in their complaint about defendants' other monitoring activities, and by failing to create a full evidentiary record concerning them, plaintiffs make it impossible for any court to determine whether defendants' monitoring activities violate federal law because they do not constitute 'appropriate action.' " (*Ibid.*)

Waterkeeper's allegations, and the trial court's ruling, similarly are "myopic," focusing solely on the State Board's lack of action in regard to the four POTWs. Just as the *Alejo* plaintiffs failed to plead or offer evidence concerning the educational authorities' monitoring efforts apart from onsite reviews, Waterkeeper's pleadings are devoid of any allegations concerning the State Board's efforts to prevent unreasonable use of water apart from evaluating the POTWs' discharges. Thus, even if Waterkeeper's allegations of the State Board's inaction regarding the POTWs were true, those allegations would be insufficient to demonstrate the State Board has taken *no* action to prevent unreasonable use.

In its ruling on the demurrer, the trial court relied on *Collins*, a case that distinguishes *Alejo*. (*Collins*, *supra*, 41 Cal.App.5th at p. 918.) The trial court offered *Collins* as an illustration of a derogation of a highly discretionary duty justifying mandamus. As we explain, the allegations in *Collins* are distinguishable from those in the instant case.

In *Collins*, similar to *Alejo*, the plaintiffs sought a writ of mandate based on duties imposed by federal law on state educational authorities "to monitor their school systems for compliance with federal equal protection requirements." (*Collins*, *supra*, 41 Cal.App.5th at p. 917.) The plaintiffs alleged a particular school district had "failed to submit the data required

59

of them for the 2011–2012 school year, yet the [state educational authorities] 'have taken no action to procure that data and have failed to implement any program or process for ensuring that the data is accurately submitted to sanction [the school district] or other districts that fail to do so.' " (*Id.* at p. 918.)

Contrasting these allegations to those in *Alejo*, the Court of Appeal stated, "[A]ppellants are not contesting only one portion of the [monitoring] program. Rather, they are alleging that the [state educational authorities], having a mandatory duty to monitor for compliance with federal law, have abused their discretion to do so by failing to implement any review of the program they implemented to ensure they are receiving the data necessary to meet their duty. This holistic attack on the [state educational authorities'] use of their discretion when implementing the law . . . is sufficient to state a claim." (*Collins*, *supra*, 41 Cal.App.5th at p. 918.)

Unlike in *Collins*, in which the plaintiffs alleged the defendants had failed to remedy deficiencies in their statewide program to monitor school districts, Waterkeeper made no such allegations concerning the State Board's statewide efforts to prevent unreasonable use of water, but instead, focused solely on the State Board's actions in regard to the four POTWs. This is not a "holistic attack," but an attack on "only one portion" of the State Board's portfolio. (*Collins*, *supra*, 41 Cal.App.5th at p. 918.)

We also observe that *Collins* was based on the state's specific, mandatory duty under federal law to monitor all school districts for compliance with federal law. As we have discussed, article X, section 2 and Water Code sections 100 and 275 do not impose a mandatory duty on the State Board to monitor or inspect wastewater treatment plants to ensure their discharges

60

are reasonable—rather, the State Board has discretion on which water users to focus its efforts to prevent waste and unreasonable use of water. Whereas in *Collins* a failure adequately to monitor school districts justified mandamus, the State Board's choice not to assess particular water users, or even a particular class of water users, for waste and unreasonable use falls within its discretion and is not subject to mandamus.

The trial court recognized, "The State Board has discretion as to when and how it will enforce its constitutional duty," and "this discretion imposes no duty to address unreasonable use in the vast majority of circumstances." The trial court found an abuse of discretion in this particular case, however, because of the size of the discharges at issue, stating, "[T]he issue is one of degree, and the difference in degree between this case and almost all other circumstances is so large as to be different in kind."

The trial court cited no authority in support of the conclusion that a particularly large potential waste of water transforms a discretionary duty into a mandatory one, nor are we aware of any. Nothing in the language of article X, section 2 or Water Code sections 100 and 275 obliges the State Board to address discharges above a certain size.

The trial court's rule, moreover, is not a workable legal standard. Neither the trial court nor Waterkeeper offers any framework by which to measure whether a particular water discharge is sufficiently large to trigger the State Board's otherwise discretionary duty to prevent waste. Without such a framework, both the State Board and water users would have no way to know when the State Board's duty is triggered until an action is brought and a court decides whether the discharge is large enough. Not only would this leave the State Board in limbo

61

as to the scope of its obligations, it would also effectively give courts carte blanche to determine where the State Board must direct its attention. Although the trial court believed the POTWs were "unique" in their quantity of discharge, and therefore its ruling would not result in courts compelling the State Board to investigate lesser discharges, this will not stop future parties from bringing litigation to test the limits of the trial court's uniqueness rule. We cannot endorse such a quixotic result.

To the extent the trial court is suggesting that an agency with broad investigatory and enforcement discretion abuses that discretion by neglecting to investigate a particularly egregious violation, we have found no authority to that effect, nor has the trial court or Waterkeeper cited any. Such neglect arguably could be evidence that the agency more broadly is failing to take action to meet its investigatory and enforcement duties, but those were not the allegations here nor did the trial court so find.

We also reject any suggestion that the State Board must explain to the court its decision not to direct its discretionary investigatory and enforcement efforts at a particular potential violation, when, as discussed, the law places no express limits on that discretion. It is true that when an agency takes official action involving its discretion, courts may review that action to " 'ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.]" (*Ridgecrest Charter School v. Sierra Sands Unified School Dist.* (2005) 130 Cal.App.4th 986, 1003.) Applying this principle, the trial court concluded that, because the State Board had yet to analyze whether the POTWs were wasting water, "the State Board cannot demonstrate a rational connection

62

between its decision to do nothing to prevent waste and its constitutional and statutory duty to do so. Nor can the State Board demonstrate that i[t] has considered 'all [or any] relevant factors.' "

We do not dispute that if the State Board affirmatively takes official action to prevent waste, such as by issuing regulations or placing conditions on particular water users, mandamus may lie to the extent the State Board abuses its discretion by doing so. Should a party petition for a writ to challenge those actions, a court likely has the power to assess whether the State Board has considered all relevant factors and taken action rationally connected to those factors.

We have found no authority, however, holding that when an agency has broad discretion in directing its investigatory and enforcement resources, its choice to direct those resources at some potential violations and not others is subject to review on mandamus. Nor would such a rule make sense in this case. Again, the State Board does not have unlimited resources, and cannot address every potential instance of purported unreasonable use of water in the state. Were the State Board required to justify itself to a court every time it chose not to address a particular instance of alleged waste, the State Board could forever be tied up in litigation over its decisions not to act or prosecute.

In this case, in essence, the trial court ruled it would not defer to the State Board's choice not to evaluate the POTWs until the State Board evaluated the POTWs and formally justified that choice with findings. If a court could force the State Board to investigate in order to explain why the State Board has chosen not to investigate, the State Board's discretion would be a nullity.

63

Nothing in article X, section 2 or the Water Code justifies such an intrusion into the State Board's discretion.

We further note that the trial court's ruling presumes the only acceptable reason the State Board could give for not taking further action regarding the POTWs is that their discharges are in fact reasonable, that is, that increased recycling is impracticable. Yet even if the discharges *are* unreasonable, the State Board nonetheless might choose to direct its enforcement efforts elsewhere, for example because other instances of water waste are more egregious, or are simpler to address and thus a more efficient use of the State Board's resources. The State Board might also choose as a policy matter to incentivize water recycling rather than mandate it. Indeed, at trial the State Board offered evidence of its efforts to encourage recycling. Such considerations are within the State Board's discretion, and the trial court's ruling, focused solely on an evaluation of the reasonableness of the POTWs' discharges, inappropriately converted a matter of discretion into a mandatory duty.

Perhaps recognizing these problems, the trial court ruled not that the State Board had to justify its inaction in every instance, but the State Board did have to do so in the face of the large discharges at issue here. As we have explained, that is not a workable standard nor one supported by the law.

Waterkeeper proposes a different tack, arguing that it is not the size of the discharges that triggers the State Board's duty, but the fact that the Regional Board affirmatively approved those discharges without regard to whether the discharges were wasteful. Waterkeeper argues that, given the State Board's duty to prevent waste, it cannot stand by and do nothing while a

subordinate agency authorizes a potentially unreasonable discharge of water.

In rejecting this argument, we return to the broad language in article X, section 2 and Water Code sections 100 and 275, which, again, do not direct the State Board to take action to prevent waste in any particular circumstance, instead leaving it to the Legislature and the State Board to determine when action is appropriate. We cannot read the broad language in these provisions to impose a mandatory duty on the State Board to review wastewater discharge permits whenever those permits authorize a large discharge of water into the environment.

Our holding here does not foreclose other avenues of relief for Waterkeeper. As we have already discussed, as a general matter, parties may directly take action in court or before the State Board against those who use water unreasonably. Our Supreme Court has recognized specifically that "causes of action seeking to compel [a] defendant to reclaim waste waters" may be brought before the State Board. (See *Environmental Defense Fund*, *supra*, 26 Cal.3d at p. 187, fn. 1, 199.) How these actions would apply to the POTWs at issue in the instant case is beyond the scope of what we must decide here, but our holding does not foreclose those actions.[17]

---

[17] At oral argument, Waterkeeper appeared to suggest it already had brought an action before the State Board when Waterkeeper requested review of the Regional Board's issuance of wastewater discharge permits to the POTWs. Seeking review of a Regional Board permitting decision, however, is not the same as bringing an action directly against a POTW's owner to compel the POTW to recycle more water or otherwise reduce its wastewater discharges.

What a party cannot do is to compel the State Board (or the Regional Board) to conduct its own unreasonable use inquiry merely based on the fact that the Regional Board has issued wastewater discharge permits, or because the discharges at issue are particularly large. The trial court erred in overruling the demurrers in favor of the State Board.

## B. Public Resources Code Section 21002 Does Not Apply to the Wastewater Discharge Permits at Issue in This Case

In its appeal, Waterkeeper challenges the trial court's ruling that the Regional Board was exempt from complying with CEQA when issuing the NPDES-equivalent wastewater discharge permits at issue in this case. Waterkeeper acknowledges that Water Code section 13389 exempted the Regional Board from chapter 3 of CEQA, governing the preparation of environmental impact reports (EIRs), when the Regional Board issued the POTWs' most recent permits.[18] Waterkeeper, however, argues the Regional Board nonetheless had to comply with other provisions of CEQA. Specifically,

---

[18] The Boards contend in their modification request that the CEQA exemption under Water Code section 13389 applies only to waste discharge permits that are the state equivalent of federal NPDES permits, and not to waste discharge permits issued pursuant to other provisions of the Water Code. Because the waste discharge permits at issue in the instant case are NPDES-equivalent permits, and the parties do not dispute the permits are subject to the Water Code section 13389 exemption, we need not, and do not decide whether the exemption applies to other types of waste discharge permits not at issue in this case.

66

Waterkeeper contends that Public Resources Code[19] section 21002, located in CEQA chapter 1, obliged the Regional Board, in Waterkeeper's words, "to make findings as to whether the project has significant and unavoidable impacts, including cumulative impacts resulting from multiple approvals of [waste discharge requirements] for POTW[s], and if so, whether there are feasible alternatives or mitigation measures that would substantially lessen those impacts."

Apart from section 21002, Waterkeeper does not argue that the Regional Board failed to comply with other yet to be identified sections in chapter 1 of CEQA or any other chapters, and therefore does not explain how the trial court's decision not to compel the Regional Board to comply with those other sections or chapters prejudiced Waterkeeper. (*D.D. v. Pitcher* (2022) 79 Cal.App.5th 1047, 1057 [appellant has burden to demonstrate prejudicial error].) Accordingly, we need only determine if the Regional Board must comply with section 21002 when issuing NPDES-equivalent wastewater discharge permits. As to this narrower issue, we conclude the trial court properly sustained the demurrer to the CEQA causes of action.

The underlying premise of Waterkeeper's argument is that section 21002 imposes environmental review requirements independent of CEQA's EIR procedures from which NPDES permits are exempt. We disagree with this premise. As we explain below, section 21002 does not impose its own environmental review requirements, but rather, states a policy the Legislature intended the EIR process to effectuate. Thus,

---

[19] Further unspecified statutory citations are to the Public Resources Code.

section 21002 only has force to the extent an entity otherwise is obligated to prepare an EIR. Because the wastewater discharge permits at issue in this case are exempt from the EIR requirement, section 21002 is inapplicable, and the Regional Board was not required to comply with that provision. We therefore need not, and do not, reach the broader question whether Water Code section 13389 provides a complete exemption from CEQA.

### 1. Legal Background

#### a. CEQA's EIR requirement

CEQA, enacted in 1970, " 'is a comprehensive scheme designed to provide long-term protection to the environment. . . .' [Citation.]" (*Pesticide Action Network North America v. Department of Pesticide Regulation* (2017) 16 Cal.App.5th 224, 238 (*Pesticide Action Network*).) "In general, CEQA 'requires various state and local governmental entities to submit environmental impact reports before undertaking specified activity. These reports compel state and local agencies to consider the possible adverse consequences to the environment of the proposed activity and to record such impact in writing.' [Citation.]" (*Pesticide Action Network*, at p. 238.)

"The EIR is often referred to as the ' " 'heart' " ' of CEQA." (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627.) "Ideally, an EIR serves 'to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided.' [Citation.] The document must include a description of the proposed project and its environmental setting and discussions of (1) the possible

environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects [citations].  An EIR may also include a discussion of the economic and social effects of the project." (*Ibid.*)

"Generally, chapter 3 of CEQA governs the preparation of EIR's by state agencies and chapter 4 governs the preparation of EIR's by local agencies." (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 710, fn. 21 (*POET*); § 21100, subd. (a) ["All lead agencies shall prepare . . . an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment."].)

### b.    The CEQA exemption for wastewater discharge permits

In 1972, the Legislature amended the Porter-Cologne Act " 'to ensure consistency with the requirements for state programs implementing the Federal Water Pollution Control Act.' [Citation.]" (*City of Burbank*, *supra*, 35 Cal.4th at p. 620; Stats. 1972, ch. 1256.)  Among the amendments, the Legislature enacted Water Code section 13389, providing, in relevant part, "Neither the state board nor the regional boards shall be required to comply with the provisions of Chapter 3 (commencing with Section 21100) of Division 13 of the Public Resources Code prior to the adoption of any waste discharge requirement . . . ."

Division 13, chapter 3 of the Public Resources Code is CEQA chapter 3.  Thus, the parties do not dispute that the State and Regional Boards were exempt from preparing an EIR as part

of the NPDES-equivalent wastewater discharge permitting process in this case.  (See *County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 1006–1007.)  One court has observed that the intent of Water Code section 13389 was to "parallel" the federal Clean Water Act, which exempts NPDES permits from the requirements of the National Environmental Policy Act.  (*Pacific Water Conditioning Assn., Inc. v. City Council* (1977) 73 Cal.App.3d 546, 556; see 33 U.S.C. § 1371(c).)

### c.  *Section 21002 of CEQA*

Section 21002, the CEQA chapter 1 provision with which Waterkeeper alleged the Regional Board failed to comply, was enacted in 1976.  (Stats. 1976, ch. 1312, § 1.)  The current version of section 21002 provides, in relevant part, "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects."

In support of its arguments under section 21002, Waterkeeper also relies on section 21006, another provision in CEQA chapter 1.  Section 21006 provides, "The Legislature finds and declares that this division is an integral part of any public agency's decisionmaking process, including, but not limited to, the issuance of permits, licenses, certificates, or other entitlements required for activities undertaken pursuant to

70

federal statutes containing specific waivers of sovereign immunity." Section 21006 was enacted in 1998. (Stats. 1998, ch. 272, § 2.)

### 2. Analysis

Waterkeeper characterizes section 21002 as containing a substantive mandate that requires the Regional Board, when issuing wastewater discharge permits, to make findings under CEQA regarding environmental impacts, and whether there are feasible alternatives or mitigation measures to lessen those impacts. Waterkeeper argues section 21006 bolsters its position with the directive that CEQA "is an integral part of any [public] agency's decisionmaking process," including, but not limited to, the issuance of permits. (Italics omitted.)

We disagree with the breadth of Waterkeeper's argument. Section 21002 is not itself a directive to conduct environmental review independent of the EIR process. Rather, it is a statement of policy to be carried out through the EIR process. In other words, section 21002 informs the EIR process, but does not impose requirements separate from the EIR process.

The language of section 21002 supports this conclusion. We repeat the first sentence of that provision: "The Legislature finds and declares that *it is the policy of the state* that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, *and that the procedures required by this division are intended to assist* public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which

71

will avoid or substantially lessen such significant effects." (Italics added.)

Thus, the Legislature states in section 21002 the general policy that public agencies should not approve projects without conducting environmental review, and then immediately declares the "procedures required by this division [i.e., CEQA]" are the intended means to carry out that policy. As discussed, the "procedures required by this division" are the EIR process.

Our reading is confirmed by the very next section of CEQA chapter 1. Section 21002.1, enacted at the same time as section 21002, provides, in pertinent part, "In order to achieve the objectives set forth in Section 21002, the Legislature hereby finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to this division . . . ." The section then lists policy guidelines for EIRs, including, "The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided," and "[e]ach public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (§ 21002.1, subds. (a), (b).)

Thus, section 21002.1 expressly declares how the Legislature intended to implement "the objectives set forth in Section 21002," and that is through "the use of environmental impact reports."

We find further support in section 21081, a provision in CEQA chapter 2.6, which our Supreme Court has stated "effectuate[s]" "CEQA's substantive mandate that public agencies

72

refrain from approving projects for which there are feasible alternatives or mitigation measures." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 (*Mountain Lion Foundation*).) Section 21081 provides, "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project *for which an environmental impact report has been certified* which identifies one or more significant effects on the environment that would occur if the project is approved or carried out" unless the agency makes certain findings regarding alternatives and mitigation measures. (§ 21081, italics added; *Mountain Lion Foundation*, at p. 134.) Again, section 21081 confirms the EIR is the means by which an agency satisfies the policy articulated in section 21002.

Waterkeeper argues that although section 21002.1 "set[s] out what an EIR should do if it is prepared," neither that section nor any other section of CEQA "require[s] an EIR to satisfy the substantive mandate of section 21002." In other words, nothing in CEQA precludes a party from complying with section 21002 by means other than an EIR.

Waterkeeper further contends the Regional Board can comply with section 21002 "using the information and analysis [the Regional Board] perform[s] in the normal course of permit approval." Waterkeeper argues the Regional Board already gathers information for the permitting process "about the contents of [the] POTW discharge, the biological resources and water quality of receiving water bodies [citations], and the potential impacts of discharge [citation]." "The permits distill this information into benchmarks, requirements for best management practices, pollution prevention requirements, and monitoring and reporting requirements—and already arguably

73

accomplish some of the requirements of CEQA's Chapter 1, in particular, with regard to mitigation." Making CEQA findings as part of the wastewater discharge permitting process should not cause undue delay, Waterkeeper claims, because Water Code section 13389 frees the Regional Board from the procedural requirements of the EIR process, specifically public comment periods and document preparation.

Assuming, as Waterkeeper claims, the Regional Board could comply with section 21002 using the information already available to it through the wastewater discharge permitting process, how is the Regional Board to know how to do so without the statutory and regulatory guidance for EIRs? How are the courts to evaluate if the Regional Board's efforts are sufficient? Waterkeeper proposes no framework, and the Legislature has provided no alternative method beyond the EIR. Inevitably, then, the courts would analogize to the EIR process and the case law interpreting it, thus assessing the Regional Board's actions by the very standards from which the Legislature exempted those actions.

Courts have held that when a statute is "vague[ ] about the actions it assertedly mandates" and "fail[s] to specify any procedure for enforcing that mandate or consequences that will ensue if it is ignored," this "suggest[s] it should be construed as an expression of policy rather than a legal mandate." (*Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1541 [interpreting Education Code section 15288 not to create a nondiscretionary duty on the part of district attorneys to investigate alleged crimes related to the expenditure of certain bond funds].) Section 21002 expressly states the "procedure[s] for enforcing [its] mandate" (*Gananian*, at p. 1541), are "the procedures required by this

division" (§ 21002), that is, the EIR procedures. Stripped of those procedures by Water Code section 13389, section 21002 becomes a statement of policy rather than a mandate to the Regional Board to apply CEQA to NPDES permits. Put another way, we will not read section 21002 to impose requirements on the Regional Board when the Legislature has specified no means to carry out those requirements apart from an EIR, from which the Regional Board expressly is exempt when granting the type of permits at issue here.

This is not to say the Regional Board is not required to engage in environmental review. That is of course the purpose of the wastewater discharge permitting process, which evaluates how much treated wastewater a treatment plant safely may discharge into the environment, taking into consideration, inter alia, "the beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, [and] the need to prevent nuisance . . . ." (Wat. Code, § 13263, subd. (a).) The Legislature, however, has opted to govern that process through the Water Code, not CEQA, at least in the context of NPDES permits. Again, we will not interpret CEQA to interpose its policy requirements into the Water Code's NPDES permitting process when the Legislature, by exempting the Regional Board from an EIR requirement, has provided no procedure for doing so.

Our conclusion is supported by *County of Los Angeles*, *supra*, 143 Cal.App.4th 985, a case upon which the trial court relied. *County of Los Angeles* confronted whether CEQA chapter 2.6, "which contains generalized requirements for the preparation of environmental impact reports for discretionary projects," required the Regional Board to prepare an EIR despite

Water Code section 13389's exemption. (*County of Los Angeles*, at pp. 1005–1006.)

Division Five of this district concluded it did not. The court noted that chapter 2.6, as enacted in 1972, provided "this division [i.e., CEQA] shall apply to discretionary projects," and required public agencies and the Office of Planning and Research to adopt procedures and guidelines for preparing EIRs. (*County of Los Angeles*, *supra*, 143 Cal.App.4th at pp. 1005–1006.) The court reasoned these new provisions did not obviate the exemption under Water Code section 13389 because the requirement that state agencies actually *prepare* an EIR remained in chapter 3, unchanged by the 1972 amendments enacting chapter 2.6. (*County of Los Angeles*, at p. 1006.) The appellate court found "no evidence the Legislature ever intended to: impose a duty on regional boards to prepare environmental impact reports; require regional boards to engage in any other form of environmental review specified in the California Environmental Quality Act; or to otherwise modify Water Code section 13389." (*County of Los Angeles*, at p. 1007.)

Under *County of Los Angeles*, the fact that sections of CEQA outside of chapter 3 apply "this division [i.e., CEQA]" to agency actions, and provide guidance on conducting environmental review, does not indicate the Legislature intended to require the Regional Board to conduct an environmental review from which the Board otherwise is exempt under Water Code section 13389. This is because, although environmental review guidance might appear outside of chapter 3, the environmental review process itself—i.e., the EIR process— remains in chapter 3, from which NPDES permits are exempt by virtue of section 13389. Here, as we have explained, the

76

Legislature has indicated in both sections 21002 and 21002.1 that the policies contained in section 21002 are implemented through "the procedures required by this division," thus referring back to the EIR procedures in chapter 3. As in *County of Los Angeles*, we cannot read that language to impose requirements beyond those in chapter 3 from which the Regional Board is exempt.[20]

We acknowledge *County of Los Angeles* differs from the instant case in that the *County of Los Angeles* appellants sought to impose a formal EIR requirement on the Regional Board through CEQA chapter 2.6, whereas Waterkeeper argues section 21002 imposes environmental review obligations on the Regional Board irrespective of any EIR requirement. *County of Los Angeles* nonetheless supports our conclusion that references in CEQA to environmental review procedures and "this division," without more, refer to the EIR obligations from which the Regional Board is exempt.

Waterkeeper argues *County of Los Angeles* is distinguishable because its holding depended on the timing of various legislative enactments, and in particular that the Legislature enacted CEQA chapter 2.6 in the same year as Water Code section 13389. In contrast, sections 21002 and 21006 were enacted years after Water Code section 13389.

We are not clear what significance Waterkeeper attributes to the timing of the various enactments. Regardless, we do not agree the timing renders *County of Los Angeles* inapposite. *County of Los Angeles* discussed the legislative timeline to

---

[20] This is not to say the Legislature could not place environmental review requirements outside of CEQA chapter 3, just that it has not done so through the enactment of section 21002.

illustrate that CEQA's EIR requirements existed in chapter 3 both before and after the enactment of chapter 2.6 and Water Code section 13389. (*County of Los Angeles*, *supra*, 143 Cal.App.4th at p. 1006 ["The obligation imposed on a state agency, board, and commission to prepare an environmental impact report existed in chapter 3 before the adoption of Water Code section 13389 and it remained there after the 1972 amendments to the California Environmental Quality Act."].) The court's implicit conclusion was that had the Legislature intended to impose the environmental review requirements of chapter 2.6 on the NPDES permitting process, the Legislature either would not have enacted the exemption in Water Code section 13389, or would have moved the EIR requirement somewhere other than chapter 3. Having done neither, the court concluded the Legislature intended to exempt NPDES permits from environmental review despite the enactment of chapter 2.6. (*County of Los Angeles*, at pp. 1006–1007.) This reasoning applies equally here, where CEQA's environmental review procedure remains in chapter 3 despite the Legislature adding additional provisions relating to environmental review to chapter 1.[21]

---

[21] The trial court relied on *County of Los Angeles* to conclude Water Code section 13389 provides a complete exemption from CEQA. We emphasize again we are not deciding that broader issue.

### 3. Our holding does not conflict with case law addressing certified regulatory programs under CEQA

Waterkeeper cites *Pesticide Action Network* as demonstrating that "a limited scope exemption from the documentary requirements contained in Chapter 3 of CEQA does not exempt an agency from 'the substantive portions of CEQA.'" As we explain, our holding does not conflict with *Pesticide Action Network*, which concerned a very different statutory regime.

*Pesticide Action Network* addressed the scope of the EIR exemption for "certified regulatory programs" under section 21080.5, a provision of CEQA chapter 2.6. (*Pesticide Action Network*, *supra*, 16 Cal.App.5th at p. 241.) These are state regulatory programs that themselves require preparation of "a plan or other written documentation containing environmental information" before authorizing certain activities. (§ 21080.5, subd. (a); see *Pesticide Action Network*, at p. 239.)

More specifically, if a state regulatory program and its environmental documentation requirements meet the statutory requirements of section 21080.5, and the program has been certified by the Secretary of the Resources Agency, the program's environmental documents "may be submitted in lieu of the environmental impact report required by this division." (§ 21080.5, subd. (a).) "The rationale for this rule is to avoid the redundancy that would result if environmental issues were addressed in both program-related documents and an EIR." (*POET*, *supra*, 218 Cal.App.4th at p. 709.) The certified regulatory program's documentation thus "serves as a functional

79

equivalent of an EIR." (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 113.)

Accordingly, section 21080.5, subdivision (c) exempts certified regulatory programs from CEQA chapters 3 and 4, governing the EIR procedures for state and local agencies, respectively. (*Pesticide Action Network, supra,* 16 Cal.App.5th at p. 239.) The parties do not dispute that the Regional Board's NPDES permitting process is not a certified regulatory program. (See *County of Los Angeles, supra,* 143 Cal.App.4th at p. 1007.)

Turning to *Pesticide Action Network*'s consideration of this statutory framework, in that case the plaintiff challenged approvals of amended labels on two pesticides by the Department of Pesticide Regulation (the Department). (*Pesticide Action Network, supra,* 16 Cal.App.5th at p. 232.) The plaintiff claimed the Department had approved the amendments without sufficient environmental review under CEQA, including "fail[ing] to address any feasible alternative to registering the proposed new uses" for the pesticides. (*Id.* at pp. 237, 244.) The plaintiff argued that although the Department was exempt from the EIR requirement, "the Department's review must still comply with CEQA's policy goals and substantive standards." (*Id.* at p. 240.)

The Department argued that because its pesticide approval program had been certified by the Secretary of the Resources Agency, the program was exempt from CEQA's substantive requirements, and therefore the Department had to comply only with the pesticide approval program's certified environmental review procedures. (*Pesticide Action Network, supra,* 16 Cal.App.5th at p. 240.)

The Court of Appeal disagreed with the Department. Citing the plain language of section 21080.5, subdivision (c) and

80

case law interpreting it, the court concluded the CEQA exemption extended only to the chapters and provisions expressly identified in the exemption, not to CEQA as a whole. (*Pesticide Action Network*, *supra*, 16 Cal.App.5th at p. 242; see *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1228 [certified regulatory program "must conform . . . to those provisions of CEQA from which it has not been specifically exempted by the Legislature"].) Thus, "the Department's program—and the environmental review documents it prepares—remain subject to the broad policy goals and substantive standards of CEQA not affected by the limited exemption set forth in . . . section 21080.5, subdivision (c)." (*Pesticide Action Network*, at p. 242.) The court then explained how the defendant's environmental findings fell short, including by failing to analyze whether there were feasible alternatives as required under section 21002. (*Pesticide Action Network*, at pp. 244–245.)

Our holding does not conflict with *Pesticide Action Network*. We have concluded that section 21002 has force only to the extent an agency is required to follow environmental review procedures under CEQA, namely the EIR procedures, because those are the procedures the Legislature has provided to carry out the policy articulated in section 21002. Certified regulatory programs are exempt from the EIR procedures under CEQA chapters 3 and 4, but only because those programs' own environmental review procedures satisfy the requirements of another section of CEQA, section 21080.5, and are deemed the functional equivalent of EIR procedures. Thus, the Legislature has not exempted certified regulatory programs from CEQA review, but merely provided an alternative method to conduct that review through the programs' own CEQA-compliant environmental review procedures. It is

81

therefore logical to conclude, as did the court in *Pesticide Action Network*, that the Legislature intended certified regulatory programs' EIR-equivalent procedures to accomplish the same policy goals the Legislature intended EIRs to accomplish.

Indeed, section 21080.5 has a subdivision mirroring the language of section 21002, mandating that certified regulatory programs "[r]equire that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment."  (§ 21080.5, subd. (d)(2)(A).)  Clearly the Legislature intended certified regulatory programs to comply with the policy articulated in section 21002 regardless of the exemption from formal EIR preparation.

The logic supporting *Pesticide Action Network*'s conclusion that section 21002 creates obligations despite the exemption under Public Resources Code section 21080.5, does not apply to the exemption under Water Code section 13389.  The EIR exemption under section 21080.5 is conditioned on a regulatory program having adequate EIR-equivalent procedures to fulfill CEQA's policy goals, including those articulated in section 21002. The EIR exemption under Water Code section 13389, however, is not conditional.  The Regional Board is exempt from preparing an EIR when issuing NPDES permits regardless of whether the Regional Board's procedures comply with section 21080.5 or any other provision of CEQA.

Thus, in contrast to certified regulatory programs, the Legislature has exempted the Regional Board from the EIR requirement without mandating an alternative means of accomplishing the policy goals of section 21002.  In the language

82

of section 21002, there are no "procedures required by this division" applicable to the NPDES permitting process. Because Waterkeeper identifies no other provision of CEQA with which the Regional Board failed to comply, the trial court did not err in sustaining the demurrer to the CEQA causes of action.

## C. The Attorney Fees Award Must Be Reversed

The trial court awarded Waterkeeper attorney fees under Code of Civil Procedure section 1021.5, which allows an award of fees "to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest." The parties agree that a full reversal of the judgments against the State Board requires we also reverse the attorney fees award, and we do so.[22]

---

[22] The only dispute in the appeal from the fees award concerns the proper disposition had we affirmed the judgments against the State Board in part. We express no opinion on that issue.

## DISPOSITION

The judgments of dismissal in favor of the Regional Water Quality Control Board, Los Angeles Region are affirmed.  The judgments and writs of mandate against the State Water Resources Control Board are reversed.  The order granting Los Angeles Waterkeeper attorney fees is reversed.

The State Water Resources Control Board, Regional Water Quality Control Board, Los Angeles Region, and City of Burbank are awarded their costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

BENDIX, Acting P. J.

We concur:

CHANEY, J.

WEINGART J.